Michael **DEMERS**, A Minor by and through his parent and next friend, John **DEMERS**, Plaintiff,

v.

**LEOMINSTER SCHOOL DEPARTMENT**, Dr. Joseph Rappa, in his capacity as Superintendent of Schools, Judith P. Mulkern, in her capacity as Principal of Northwest School, and Susan Hitchcock, in her capacity as Pupil Personnel Director, Defendants.

No. CIV.A.00–40082–CBS.

United States District Court, D. Massachusetts.

May 16, 2003.

See also 96 F.Supp.2d 55.

John A. Bosk, Jr., Attorney John Bosk, Fitchburg, MA, for Michael Demers, John Demers, Plaintiffs.

John J. Davis, William B. Scarpelli, Pierce, Davis, Fahey & Perritano, LLP, Boston, MA, for Joseph Rappa, Dr., Judith P. Judith P. Mulkern, Principal of Northwest School, Susan Hitchcock, Pupil Personnel Director, Defendants.

## MEMORANDUM OF LAW AND ORDER FOR JUDGMENT

SWARTWOOD, United States Magistrate Judge.

### Nature of the Proceeding

On April 13, 2001, this case was referred to me by consent of the parties for all further proceedings in accordance with 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73. This Order addresses the Defendants' Leominster School Department, Dr. Joseph Rappa, Judith P. Mulkern, and Susan Hitchcock, Motion for Summary Judgment (Docket No. 50) as to all counts.

### Nature of the Case

Plaintiff Michael Demers ("Michael"), a minor, by his father, John Demers (collectively, "the Demers"), filed a fifteen count complaint against the Defendants, Leominster School Department ("the School"), Dr. Joseph Rappa ("Dr.Rappa"), in his capacity as Superintendent of Schools for the City of Leominster, Judith Mulkern ("Ms.Mulkern"), in her capacity as Principal, and Susan Hitchcock ("Ms.Hitchcock"), in her capacity as Pupil Personnel Director of the Northwest School in Leominster, Massachusetts. Michael alleges civil rights claims under U.S.C. § 1983 against all Defendants for violation of his rights to free speech, privacy, procedural and substantive due process, and equal protection pursuant to the First and Fourteenth Amendments to the United States Constitution. Michael also asserts claims for the same rights under the Massachusetts Declaration of Rights and the Massachusetts General Laws.

### Facts

1. In the Spring of 2000, Plaintiff, Michael Demers, was fifteen years old and in the eighth grade at the Northwest School in Leominster, Massachusetts. *Verified Complaint and Request for Injunctive Relief* (Docket No. 1) (*"Complaint"*), ¶ 4. He was classified as a special needs student pursuant to M.G.L. c. 71B. *Id.*

2. Michael has a history that includes disruptive classroom behavior, substance abuse problems, incidents involving assaultive behavior to students and school staff, psychiatric hospitalizations, and court probation. *Appendix to Defendants' Memorandum in Support of Summary Judgment* (Docket No. 50) (*"Def's.Mem."*), *Exhibit A* (*"Ex.A"*), *Affidavit of Susan Hitchcock* (*"Hitchcock Aff."*), ¶¶ 4, 5, 10 and 12.

3. On April 5, 2000, Michael was talking during his English class. *Complaint,* ¶ 10. Michael's English teacher, Mrs. Roselli, asked him to stop. *Id.* When Michael continued to talk, Mrs. Roselli asked him to leave the room. *Id.*

4. Michael went next door to the classroom of a substitute math teacher, Mr. Gendron. *Complaint,* ¶ 11. Michael informed Mr. Gendron that he had been ordered out of his English class. *Id.* Mr. Gendron gave Michael a piece of paper and asked him to draw a picture showing how he felt about being kicked out of class. *Id.*

5. On one side of the paper, Michael made a drawing of the school surrounded by explosives, with students hanging out the windows crying for help. *Complaint,*

Exhibit B ("*Ex.B*"). He labeled the type of explosives (C–4) and in one instance the amount of explosives (7 lbs.). *Id.* On the other side of the paper, Michael drew a picture of Dr. Joseph Rappa, the Superintendent of Schools, with a gun pointed at his head and explosives at his feet. *Id.*

6. Michael gave the drawing to Mr. Gendron, who shared the pictures with the principal, Judith Mulkern. Nothing more was said about the drawings at that time. *Complaint*, ¶ 13.

7. The following day, Michael wrote the phrases "I want to die" and "I hate life" repeatedly down a sheet of paper and threw it away. This paper was also given to Mrs. Mulkern. *Def's. Mem., Ex. A, Hitchcock Aff.*, ¶ 16; *Exhibits to Susan Hitchcock Affidavit* (Docket No. 12) ("*Hitchcock Ex.*"), Ex. 12, Michael Demers Handwritten Note ("*Demers note*").

8. On April 7, 2000, Michael was called to meet with Mrs. Mulkern in her office and questioned about the drawing and the note. *Def.'s Mem., Exhibit D ("Ex.D")*, Deposition of Judith Mulkern Gordon ("*Mulkern Dep.*"), p. 53. Michael's father appeared 20 minutes after Michael appeared in the office. *Plaintiff's Opposition to Defendants' Motion for Summary Judgment with Incorporated Memorandum of Law* (Docket No. 63) ("*Pl's. Opp.*"), *Statement of Material Undisputed Facts*, ("*Pl's.Facts*"), ¶ 6.

9. After the meeting, Mrs. Mulkern suspended Michael pending the outcome of a TEAM meeting to be held on Tuesday, April 11, 2000. *Complaint*, ¶¶ 17–18.

10. On April 11, 2000, a meeting was held with Michael, Mr. Demers, Mrs. Mulkern, Mrs. Hitchcock, Cynthia O'Brien, the School Psychologist, and John Hathaway, the Assistant Vice Principal. *Id.* at ¶ 19. The school officials agreed to allow Michael to remain in school on the condition that he: 1) receive a psychiatric evaluation; 2)behave properly; and 3) do his school work. *Pl.'s Opp., Exhibit B ("Ex.B"), Deposition of Michael Demers ("Demers' Dep."),* pp. 80, 83. A psychiatric evaluation had already been scheduled by Michael's parents for April 25, 2000. *Def's. Mem., Ex. A, Hitchcock Aff.,* ¶ 17.

11. Michael attended school for the remainder of the week of April 11–14, 2000. School was not in session during the week of April 17–22, 2000 due to vacation. *Def.'s Mem., Statement of Material Undisputed Facts,* ¶ 13.

12. On April 25, Michael refused to attend the private psychiatric evaluation. *Pl.'s Opp., Ex. B, Demers' Dep.,* p. 85.

13. After notifying Mr. Demers that his son could not remain in school because of his refusal to undergo the psychiatric evaluation, Mrs. Mulkern arranged a TEAM meeting for May 1, 2000, which was attended by Michael and his father. *Def.'s Mem., Ex. D, Affidavit of Judith Mulkern ("Mulkern Aff."),* ¶¶ 10–11.

14. At the meeting, it was decided that Michael would be suspended for the remainder of the academic year. *Def.'s Mem., Hitchcock Aff.,* ¶ 21; *Pl.'s Mem., Ex. E., Disciplinary Record of Michael Demers.* It was also decided that Michael would be placed in a 45–day interim alternative educational setting in an out-of-district, private day school. *Def.'s Mem., Ex. A, Hitchcock Aff.,* ¶ 21.

15. On May 1, 2000, Mrs. Mulkern sent a certified letter to Michael and his parents, notifying them of the suspension and that alternative educational services were being provided. *Pl.'s Mem., Ex. G, Complaint, Ex. 3; Def.'s Mem., Ex. C, Mulkern Aff.,* ¶ 11.

16. On May 6, 2000, Michael's lawyer set a letter to Dr. Rappa, requesting an

appeal hearing of Michael's suspension. *Pl.'s Mem., Ex. J.*

17. School officials declined to provide an appeal. *Pl.'s Mem., Ex. G, Complaint,* ¶ 23.

18. On June 2, 2000, during a pre-hearing conference call with a hearing officer at the Massachusetts Bureau of Special Education Appeals ("BSEA"), the school agreed to allow Michael to return to school on Monday, June 5, 2000. *Pl.'s Mem, Statement of Undisputed Material Facts,* ¶ 16; *Def.'s Mem., Statement of Undisputed Material Facts,* ¶ 24.

## Summary Judgment

Summary judgment is appropriate when the record indicates that "there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. " 'A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party. A fact is material if it carries with it the potential to affect the outcome of the suit under applicable law.' " *Santiago–Ramos v. Centennial P.R. Wireless Corp.,* 217 F.3d 46, 52 (1st Cir.2000) (internal citations omitted) (quoting Fed. R.Civ.P. 56(c) and *Sanchez v. Alvarado,* 101 F.3d 223, 226 (1st Cir.1996)). "To succeed [in a motion for summary judgment], the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair,* 902 F.2d 140, 143 (1st Cir.1990); see also *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"Once the moving party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.' " *Barbour v. Dynamics Research Corp.,* 63 F.3d 32, 37 (1st Cir.1995) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The record evidence must be construed "in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party." *Feliciano de la Cruz v. El Conquistador Resort and Country Club,* 218 F.3d 1, 5 (1st Cir.2000).

## Discussion

I. *Free Speech Pursuant to the First Amendment of the United States Constitution and 42 U.S.C. § 1983*

■ Michael argues that his drawing is protected by the First Amendment and that he was unconstitutionally disciplined for its content. The Defendants contend that Michael's drawing was considered a threat to the safety of the students at Northwest School and not entitled to Constitutional protection. Additionally, Defendants argue that Michael was not disciplined solely because of the drawing, but was excluded from school based on several factors including his school disciplinary record and prior acts of violence in school, which indicated that he may be a danger to himself and the safe operation of the school.

■ The first step in establishing a First Amendment violation is determining whether the plaintiff's speech is protected under the Constitution. While the Supreme Court has made it clear that public school students do not shed their constitutional rights "at the schoolhouse gate," see *Tinker v. Des Moines Indep. Community School Dist.,* 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), it has also established that a student's First Amendment rights "are not coextensive with the rights of adults in other settings." *Bethel*

*School Dist. No. 403 v. Fraser,* 478 U.S. 675, 682, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986). School officials have the authority to limit, restrict or punish: (1) speech that causes a substantial and material disruption of the school's operation, or which impinges upon the rights of other students, *Tinker,* 393 U.S. at 508, 89 S.Ct. 733 (upholding high school students' right to wear black armbands in protest against the Vietnam War); (2) vulgar or lewd speech, *Bethel,* 478 U.S. at 683, 106 S.Ct. 3159 (holding school could punish students for making lewd remarks at school assembly); and (3) school-sponsored speech that is limited to legitimate educational concerns, *Hazelwood School District v. Kuhlmeier,* 484 U.S. 260, 273, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) (holding that school principal could censor student newspaper).

This circuit has not ruled on the factually specific issue of whether a student's violent drawings are constitutionally protected speech. The Ninth Circuit, however, has recently decided two cases with analogous facts. In *Lovell v. Poway Unified School District,* 90 F.3d 367 (9th Cir. 1996), a high school student's threat of physical violence to her guidance counselor resulted in a three-day suspension. The court determined that analysis of the line of Supreme Court cases that established and refined whether a student's free speech rights had been limited need not be reached. *Id.* at 371. Instead, the Lovell court applied the "true threat" doctrine set forth in *Watts v. United States,* 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) and determined that the statement made by fifteen year old Sarah Lovell, allegedly threatening to shoot her guidance counselor in connection with a proposed schedule change, was not entitled to First Amendment protection because Lovell should have foreseen that her words would be seen as a threat to the guidance counselor. *Lovell,* 90 F.3d at 373.[1]

In *LaVine v. Blaine School District,* a high school student was expelled in connection with a violent poem he showed a teacher. The District Court overturned the expulsion. Reversing the trial court on the First Amendment speech issue, the Appeals Court applied the *Tinker* standard and held that the school district did not violate eleventh grader James LaVine's First Amendment rights. *LaVine,* 257 F.3d at 989. In applying *Tinker,*[2] the court considered the totality of facts, including LaVine's previous suicidal ideations, domestic issues, and prior school disciplinary issues, and "given the backdrop of actual school shootings," held that school officials reasonably could have "forecast" substantial disruption or material interference with school activities, although none occurred. *Id.* at 989–990. The court did not reach the issue of whether the poem was considered a "true threat," because it concluded that the school's actions were justified, even if poem were protected speech. *Id.* at 989, n. 5.

---

**1.** Another Ninth Circuit case, relying on *Watts,* set forth the objective test that the *Lovell* court applied. See *Lovell,* 90 F.3d at 371, citing *United States v. Orozco–Santillan,* 903 F.2d 1262 (9th Cir.1990):

> [W]hether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault.... Alleged

threats should be considered in light of their entire factual context, including the surrounding events and the reaction of the listeners.

**2.** The LaVine court relied on two other Ninth Circuit interpretations of *Tinker* in its analysis: *Karp v. Becken,* 477 F.2d 171, 174 (9th Cir.1973) and *Chandler v. McMinnville School Dist.,* 978 F.2d 524, 527–531 (9th Cir.1992).

Without deciding which standard is appropriate, I will analyze this matter under both doctrines.

## A. *"True Threat" Doctrine*

The Supreme Court in *Watts* did not set forth a particular definition of a true threat that distinguishes an unprotected threat from protected speech. The federal courts of appeals have defined an objective test that focuses on whether a reasonable person would interpret the alleged threat as a serious expression of an intent to cause a present or future harm. See *United States v. Fulmer*, 108 F.3d 1486, 1490–1491 (1st Cir.1997). The views of the courts diverge, however, when determining the viewpoint of the statement. *Id.* The First Circuit, in a criminal case, interpreted a threat from the viewpoint of the speaker, taking into account the factual context in which the statement was made, see *id.* at 1491. See also *Lovell v. Poway Unified School District*, 90 F.3d 367, 372 (9th Cir.1996).[3] "[T]he appropriate focus is on what the defendant reasonably should have foreseen." *Fulmer*, 108 F.3d at 1491–1492. Under this standard, there is no requirement that the speaker had the ability or actually intended to carry out the threat. *Id.* at 1494, citing *United States v. Orozco–Santillan*, 903 F.2d 1262, 1265 (9th Cir.1990). Michael should have concluded that his drawing and note would be considered a threat to the school and to himself.

## B. *The Tinker Standard*

Public school officials have been granted "substantial deference as to what speech is appropriate." *LaVine v. Blaine School District*, 257 F.3d 981, 988 (9th Cir.2001). "'The daily administration of public education is committed to school officials.'"

*Id.*, quoting *Epperson v. Arkansas*, 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968). "'The determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board,' rather than with the federal courts." *Hazelwood*, 484 U.S. at 267, 108 S.Ct. 562, quoting *Fraser*, 478 U.S. at 683, 106 S.Ct. 3159 (internal citations omitted). In order to suppress speech that is not constitutionally protected, the court must justify its decision by showing "facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities." *Tinker*, 393 U.S. at 514, 89 S.Ct. 733.

This Court recently reviewed the state and federal free speech rights of high school students, and underscored the importance of students' freedom of expression. *Westfield High School L.I.F.E. Club v. City of Westfield*, 249 F.Supp.2d 98, 2003 WL 1339052, *10 (D.Mass.2003). However, the potential for disruption or disorder to the students of the Northwest School was greater than merely the School's negative reaction to an unpopular political viewpoint. *Id.*, citing *Tinker*, 393 U.S. at 513, 89 S.Ct. 733.

This case is unlike *Tinker*. It did not involve "silent, passive, expression of opinion, unaccompanied by any disorder or disturbance." *Tinker*, 393 U.S. at 508, 89 S.Ct. 733. In keeping with the School official's testimony regarding concern for Michael's and other students safety, I find that the matter was dealt with in an expeditious, but not hasty, manner. Michael created the drawing in school on April 5, 2000, which was turned over to the principal, Mrs. Mulkern. The following day at school, April 6, 2000, Michael repeatedly wrote the phrases "I want to die" and "I

---

**3.** Other circuits ask how a reasonable recipient would perceive the statement. See *Doe v. Pulaski County Special School District*, 306 F.3d 616, 624 (8th Cir.2002); *U.S. v. Malik*, 16 F.3d 45, 49 (2d Cir.), *cert denied*, 513 U.S. 968, 115 S.Ct. 435, 130 L.Ed.2d 347 (1994).

hate life" on a sheet of paper, which was also given to Mrs. Mulkern. Mrs. Mulkern, with both of Michael's compositions and knowledge of his disciplinary record, confronted Michael on Friday, April 7, 2000. The matter became the focus of a previously scheduled TEAM meeting for Michael on Tuesday, April 11, 2000, where the School officials allowed Michael to return to classes, but conditioned the return on a psychiatric evaluation.

On these facts, a reasonable interpretation of the law would allow a school official to prevent potential disorder or disruption to school safety, particularly in the wake of increased school violence across the country.

> We review, however, with deference, schools' decisions in connection with the safety of their students even when freedom of expression is involved. At the time when school officials made their determination to emergency expel [him], they had facts which might reasonably have led them to forecast a substantial disruption of or material interference with school activities.

LaVine, 257 F.3d at 992, citing Tinker, 393 U.S. at 514, 89 S.Ct. 733.

It would have been unthinkable for the Northwest School officials not to have taken any action in this case. Given the difficulty in balancing safety concerns and free expression, I conclude that their actions were reasonable and did not violate Michael's First Amendment Rights.

## II. *The Right to Privacy*

■ Although not fully developed in his brief, Michael appears to assert that his Constitutional right to privacy was violated by the requirement that he submit personal information in the form of a psychological examination. In general, there is a "right of privacy" under the Fourteenth Amendment's concept of personal liberty. This has been characterized as having two branches of interest, an interest in avoiding the disclosure of personal matters and an interest in independence in making certain kinds of important decisions. *Whalen v. Roe*, 429 U.S. 589, 599, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). The former is often labeled as an interest in "confidentiality" and the latter an interest in "autonomy." [4]

**4.** The First Circuit has not directly decided whether the first category, confidentiality, protects individuals against dissemination of their confidential medical information. See *Pouliot v. Town of Fairfield*, 184 F.Supp.2d 38, 50 (D.Me.2002). The Court in *Pouliot* relied on the First Circuit holding in *Vega–Rodriguez v. Puerto Rico Telephone Co.*, 110 F.3d 174 (1st Cir.1997), stating that the confidentiality branch can include protection from the disclosure of medical information. In *Vega–Rodriguez*, the Court stated:

> The autonomy branch of the Fourteenth Amendment right to privacy is limited to decisions arising in the personal sphere— matters relating to marriage, procreation, contraception, family relationships, child rearing, and the like. See *Paul [v. Davis]*, 424 U.S. [693] at 713, 96 S.Ct. [1155] at 1166[, 47 L.Ed.2d 405]; *Griswold v. Connecticut*, 381 U.S. 479, 485–86, 85 S.Ct. 1678, 1682–83, 14 L.Ed.2d 510 (1965)

> ....Even if the right of confidentiality has a range broader than that associated with the right to autonomy, but cf. *Borucki [v. Ryan]*, 827 F.2d [836] at 841–42 [1st Cir. 1987] (suggesting that the right of confidentiality protects only information relating to matters within the scope of the right to autonomy), that range has not extended beyond prohibiting profligate disclosure of medical, financial, and other intimately personal data. See *id.* at 841 n. 8 & 842 (collecting cases).

*Vega–Rodriguez*, 110 F.3d at 183.

*Vega–Rodriguez* only says that the confidentiality branch does not go beyond the disclosure of medical information or intimately personal data; it does not establish the parameters of this right. Because Michael does not allege that his psychiatric examination was disseminated or disclosed in any way, this issue need not be reached.

The present matter falls within the confidentiality branch.[5]

There is no evidence in the record of Michael's psychiatric evaluation ever taking place. While the Defendants initially conditioned Michael's return to school on the results of an evaluation, that condition was apparently not enforced at the time of Michael's return to school on June 5, 2000. Assuming, without deciding, that Michael had a right to privacy in resisting the School's request for an evaluation, I find that the request was prompted by a desire to ensure that both Michael and the students at the Northwest School remain safe. See *Whalen,* 429 U.S. at 599, 97 S.Ct. 869; see also *New Jersey v. T.L.O.,* 469 U.S. 325, 339–340, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (balancing, in the Fourth Amendment context, students' interests in privacy against schools' interests). Although Michael denied any intentions of carrying out a scene like the one he depicted in his drawing, the drawing, coupled with his past behavioral problems, psychiatric issues and his repetitive "I want to die" notations, forms a valid basis for requiring him to undergo a psychiatric evaluation prior to returning to classes. Given the content of Michael's drawings and considering several incidents showing violence or aggression in his school record and his emotional disabilities that were known to the Defendants, the requirement that Michael submit to psychological testing prior to returning to class would not be an invasion of his privacy. Hence, the Defendants are entitled to summary judgment on this claim.

**III.** *Right to Procedural Due Process Pursuant to the Fourteenth Amendment of the United States Constitution and 42 U.S.C. § 1983*

Michael argues that he was denied due process of law because, prior to his suspension, he was not afforded appropriate written notice of the suspension and was not given the opportunity to challenge the accuracy of the facts that led to his suspension. Defendants argue that Michael was afforded due process because, in accordance with the requirements set forth in *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), Michael was given oral notice of the charges against him, an explanation of the evidence and more than one opportunity to present his side of the story.

In order to state a Section 1983 procedural due process claim, Michael must establish "(1) that [he] has a property interest defined by state law; and (2) that the defendants, acting under color of state law, deprived [him] of that interest without adequate process." *Licari v. Ferruzzi,* 22 F.3d 344, 347 (1st Cir.1994), citing *PFZ Properties, Inc. v. Rodriguez,* 928 F.2d 28, 30 (1st Cir.1991). A student's interest in pursuing an education is included within the protections of "liberty" and "property." *Gorman v. University of Rhode Island,* 837 F.2d 7, 12 (1st Cir.1988) (citing *Goss v. Lopez,* 419 U.S. at 574–75, 95 S.Ct. 729). Thus, a student who is faced with suspension from school is entitled to the protections of due process. *Id.* See also *Goss,* 419 U.S. at 575–76, 95 S.Ct. 729. A student facing suspension, therefore, at the very minimum "must be given some kind of notice and afforded some kind of hearing." *Goss v. Lopez,* 419 U.S. at 579, 95

---

**5.** The right of a governmental employer to condition employment on a psychological evaluation if the employee's psychological fitness is in question has been recognized.

*Daury v. Smith,* 842 F.2d 9, 14 (1st Cir.1988); *Lyons v. Sullivan,* 602 F.2d 7, 10, *cert. denied,* 444 U.S. 876, 100 S.Ct. 159, 62 L.Ed.2d 104 (1979).

S.Ct. 729. The Supreme Court held that students suspended for ten days or less are entitled to oral or written notice of the charges ·and, if the student denies those charges, an explanation of the evidence against him and an opportunity to present his side of the story. *Id.* at 581, 95 S.Ct. 729. The school official "may informally discuss the alleged misconduct with the student minutes after it has occurred." *Id.* at 582, 95 S.Ct. 729. Therefore, a delay between the time that notice is given and the time of the hearing is not necessary. *Id.* See also *Gorman,* 837 F.2d at 12.

▆ The due process requirements of *Goss* were met with regard to Michael's initial suspension. On April 7, 2000, Michael was notified of the School's concerns when he met with the principal, Mrs. Mulkern, to discuss the drawings and was given an opportunity to explain them. Michael did not deny making the drawing. Michael attended a TEAM meeting with his father on April 11, 2000, where the drawing was discussed, along with the School's request for a psychiatric evaluation prior to Michael's return to school. Notably, Michael was allowed to remain in school pending the evaluation, which was scheduled for April 25, 2000.

When Michael failed to attend the scheduled evaluation, an additional meeting was held with school officials on May 1, 2000, again with Michael and his father present. It was not until that point that Defendants made the decision to exclude Michael from classes for the remainder of the school year. Michael returned to school on June 5, 2000, following an appeal to the Massachusetts Bureau of Special Education Appeals.[6]

Michael clearly had notice of his alleged misconduct and had ample opportunity to explain his version of the events to school officials. The events in this case indicate that actions of the Defendants comported with the requirements of due process. Accordingly, Michael fails to state a claim of procedural due process and the Defendants are entitled to summary judgment on this claim.

IV. *Right to Substantive Due Process Pursuant to the Fourteenth Amendment of the United States Constitution and 42 U.S.C. § 1983*

▆ Substantive due process has been characterized as "impos[ing] limits on what a state may do regardless of what procedural protection is provided." *Pittsley v. Warish,* 927 F.2d 3, 6 (1st Cir.), *cert. denied,* 502 U.S. 879, 112 S.Ct. 226, 116 L.Ed.2d 183 (1991). To support a substantive due process claim, Michael must establish either that the School's actions were sufficient to "shock the conscience," *id.,* quoting *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952), or were "a violation of an identified liberty or property interest protected by the due process clause." *Id.* "A viable substantive due process claim requires proof that the state action" was *"in and of itself* ... egregiously unacceptable, outrageous, or conscience-shocking." *Id.,* citing *Amsden v. Moran,* 904 F.2d 748, 754 (1st Cir.1990) (emphasis in original).

Substantive due process with regard to a student's right to an education has been addressed by the Sixth Circuit Court of Appeals in the case of *Seal v. Morgan,* 229 F.3d 567 (6th Cir.2000). See *Brian A. v. Stroudsburg Area School District,* 141 F.Supp.2d 502, 510 (M.D.Pa.2001). "The

---

6. The appeal hearing was never held. During a pre-hearing telephone conference between the Hearing Officer and the School, the School agreed to allow Michael to return to classes on June 5, 2000, for the remainder of the school year.

Supreme Court has held explicitly that the right to attend public school is not a fundamental right for the purpose of due process analysis ... In the context of school discipline, a substantive due process claim will succeed only in the 'rare case' when there is no rational relationship between the punishment and the offense."

*Seal v. Morgan,* 229 F.3d at 574–575 (internal citations omitted).

Under either analysis, the result is the same. None of the facts alleged, viewed in a light most favorable to Michael, show conduct that would rise to the level of shocking the conscience or extreme physical conduct. Furthermore, there is clearly a rational relationship between Michael's punishment and the offense of creating a threatening drawing. Accordingly, since there has been no violation of Michael's substantive due process rights, summary judgment will enter for the Defendants on the claim of substantive due process.

### V. *Violation of Right to Equal Protection Pursuant to the Fourteenth Amendment*

■ In order to state a viable equal protection claim under the Fourteenth Amendment, Michael must establish either that he was treated differently from another who is similarly situated, *see Koelsch v. Town of Amesbury,* 851 F.Supp. 497, 501 (D.Mass.1994), or that Defendants "grossly abused" their power, engaged in "invidious discrimination" or utilized "fundamentally unfair procedures." *Nestor Colon Medina & Sucesores, Inc. v. Custodio,* 964 F.2d 32, 44 (1st Cir.1992). In analyzing an equal protection claim, the Court must first determine what standard of review to apply. The strict scrutiny standard should be applied if Michael alleges he was treated differently because of membership in a suspect class or because he exercised a fundamental right. The less rigorous "ra-

tional relationship" standard requires that Michael's treatment was rationally related to a legitimate governmental interest. *Palmer v. Merluzzi,* 689 F.Supp. 400, 413 (D.N.J.1988).

■ Because Michael does not allege that he was treated differently than other similarly situated students at the Northwest School and he was not exercising a fundamental right, *San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 38–40, 93 S.Ct. 1278, 1299–1300, 36 L.Ed.2d 16 (1973) (rational basis test to be applied to state action which infringes upon a person's right to obtain education), the rational relationship standard applies to his claim. So long as the action is directed to a legitimate or substantial purpose and is rationally related to achieving that purpose, it is not unconstitutional. *Plyler v. Doe,* 457 U.S. 202, 224, 102 S.Ct. 2382, 2398, 72 L.Ed.2d 786 (1982).

Michael's suspension and subsequent expulsion were rationally related to the School's interest in maintaining a safe school environment, particularly in light of the apprehensive climate that existed at the time due to highly publicized incidents of school violence around the country. In the wake of other episodes of school violence, many of which occurred close in time to the events in this case, student safety had to be considered by the school officials in Leominster when faced with a potentially dangerous situation. Accordingly, as the actions of the School Officials did not violate Michael's right to equal protection, summary judgment will enter on Count VII.

### VI. *Whether the Individual Defendants Are Entitled to Qualified Immunity.*

■ "Qualified immunity protects public officials from section 1983 civil liability so long as they 'acted reasonably under

settled law in the circumstances.'" *Veil-leux v. Perschau*, 101 F.3d 1, 2 (1st Cir. 1996) (quoting *Hunter v. Bryant*, 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991)). The Supreme Court, in *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002), recently held that the critical question in the qualified immunity inquiry is "whether the state of the law [at the time of the action in question}] gave the [School officials] fair warning that their alleged [actions were] unconstitutional." Under the doctrine of qualified immunity, "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). For a right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. at 739, 122 S.Ct. 2508, quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

■ Michael argues that he had a clearly established property right as a public school student and therefore, he could not be denied his constitutional rights to free speech, privacy, due process and equal protection. Whether a constitutional right is clearly established is a question of law for the court. *Suboh v. District Attorney's Office of Suffolk County*, 298 F.3d 81, 90 (1st Cir.2002). A right is not "clearly established" unless "at the time the challenged conduct occurred, the contours of the right were sufficiently plain that a reasonably prudent state actor would have realized not merely that his conduct might be wrong, but that it violated a particular constitutional right." *Martinez v. Colon*, 54 F.3d 980, 988 (1st Cir. 1995) (citations omitted). See also

*Anderson v. Creighton*, 483 U.S. at 640, 107 S.Ct. 3034 (holding that clearly established rights are rights which are "sufficiently clear that a reasonable official would understand that what he is doing violates that right"). Even if the law is clearly established, an official is entitled to qualified immunity if at the time of the challenged actions, such official's belief that his or her actions were lawful is "objectively legally reasonable." *Creighton*, 483 U.S. at 641, 107 S.Ct. 3034. While the Supreme Court in *Hope* instructs that an official "can still be on notice that their conduct violates established law even in novel factual circumstances," *Hope v. Pelzer*, 536 U.S. at 741, 122 S.Ct. 2508, its holding emphasized that holding that the salient question is whether the state of the law gave defendants "fair warning" that their conduct was unconstitutional. *Suboh*, 298 F.3d at 93, citing *Hope v. Pelzer*, 536 U.S. at 740, 122 S.Ct. 2508; see *Savard v. Rhode Island*, 320 F.3d 34, 2003 WL 282421, *3–5 (1st Cir.)

The focus of the inquiry is not on the merits of the plaintiff's underlying claims, but on the objective legal reasonableness of the official's conduct. *Lowinger v. Broderick*, 50 F.3d 61, 65 (1st Cir.1995); *Collins v. Marina–Martinez*, 894 F.2d 474, 478 (1st Cir.1990). The qualified immunity standard " 'gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.'" *Lowinger v. Broderick*, 50 F.3d at 65 (internal quotations omitted). "A reasonable, though mistaken conclusion about the lawfulness of one's conduct does not subject a government official to personal liability." *Id.*

Michael argues that the school officials are not shielded from liability by qualified immunity because they violated his constitutional rights to free speech, privacy, due process and equal protection when they excluded him from school as a result of his

drawing. The individual defendants argue that they are entitled to qualified immunity since they are government officials performing discretionary functions or, alternatively, that they did not violate any of Michael's rights because such rights were not clearly established. In addition, the defendants argue that even if it is determined that Michael was deprived of his rights, they are entitled to qualified immunity because it was objectively reasonable for them to have considered Michael's drawing a danger to the students and faculty and to suspend him pending a psychiatric exam.

■ Because I determined that Michael's constitutional rights were not infringed by the actions of the School Officials, no reasonable government official in the Defendants' shoes would have believed that he or she was violating Michael's rights by suspending him because of the drawing and note. Michael had a record of emotional disturbances and school behavioral problems, some which involved violence or aggression toward others. It was not clearly established at the time that Michael was suspended that disciplining a student, who made a violent and threatening drawing, violated that student's constitutional rights. Finally, there is limited case law on the issue of school violence in this Circuit, which lends further credence to conclude that this area of the law is unsettled. See *Elder v. Holloway*, 510 U.S. 510, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994) (if the status of the right is unclear or unsettled, qualified immunity is proper). Therefore, the individual Defendants are entitled to qualified immunity.

VII. *Whether the Leominster School Department Can Be Liable for Violation of Michael's Federal Constitutional Rights.*

■ The Leominster School Department can be held liable under Section 1983 only if one of its policies or customs caused the alleged deprivation of Michael's' constitutional rights. See *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 166, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) (municipality not immune from suit under Section 1983, however it "cannot be held liable unless a municipal policy or custom caused constitutional injury"). The School argues that Michael has failed to allege or argue sufficient facts to establish that Leominster School Officials were acting pursuant to an official custom or policy when it allegedly violated his rights. In order to do so, Michael would have to establish, in essence, that the School had a policy or custom of disciplining students in a way that denied them their constitutional rights to due process, privacy and equal protection. Because I do not find evidence in the record of a custom or policy of the Leominster Schools that systemically deprives students of their due process rights, and because the facts of this case show that the decisions of the School officials were not based on a specific policy, the Leominster School Department cannot be held liable under Section 1983.

VIII. *Plaintiff's State Law Claims*

■ With the disposal of all of Plaintiffs' federal claims, the next question presented is whether this Court continues to have jurisdiction over Plaintiffs' state law claims. A federal court has pendent jurisdiction over a state claim when that claim and a federal claim before the court derive from a common nucleus of operative fact. *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). "[I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *Id.* at 726, 86 S.Ct. 1130.

I have allowed summary judgment as to Plaintiff's federal claims. Consistent with the mandate in *Gibbs*, this Court will not exercise pendent jurisdiction over Plaintiffs' remaining state law claims and the state law claims are therefore, dismissed without prejudice.

### Conclusion

Defendants' motion for summary judgment (Docket No. 50) is *allowed*. The Clerk shall enter judgment for the Defendants on Counts I, III, V, and VII and the remaining Counts are dismissed without prejudice.