Adam PORTER and Andrew Porter Breen, by and through his mother and next friend, Mary LeBLANC

v.

ASCENSION PARISH SCHOOL BOARD; Robert Cloutare, Superintendent, Ascension Parish School Board, in his official capacity; Conrad Braud, Principal, East Ascension High School, individually and in his official capacity; and Linda Wilson, Principal, Galvez Middle School, individually and in his official capacity

No. CIV.A.02–274–B–M2.

United States District Court, M.D. Louisiana.

Jan. 21, 2004.

Dan Michael Scheuermann, Keith Harding Grant, Clifton O. Bingham, Jr., Roger Wayne Harris, Alden Alfred Clement, Jr., Oats & Hudson, Baton Rouge, LA, for Plaintiffs.

Gustave A. Fritchie, III, Alan Dabdoub, Irwin, Fritchie, Urquhart & Moore LLC, New Orleans, LA, for Defendants.

## CORRECTED RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

POLOZOLA, Chief Judge.

This case requires the Court to balance the right of school officials and a school board to properly discipline, protect and educate its students against the First, Fourth, Eighth and Fourteenth Amendment protections claimed by a student. To fully understand the legal and factual issues involved, it is necessary to set forth the procedural and factual background leading up to the filing of this suit. The Court must also determine how far a federal court must and should involve itself in school disciplinary matters, particularly where the security of the students, staff and school facilities are at issue and the education of the students in a safe environment for learning is of primary importance.

### I. Background

#### A. Procedural Background

On March 15, 2002, Adam Porter and his brother Andrew Porter Breen, filed this suit against the Ascension Parish School Board; Robert Cloutare, in his official capacity as Superintendent of the Ascension Parish School Board; Conrad Braud, both individually and in his official capacity as Principal of East Ascension High School; and Linda Wilson, both individually and in her official capacity as Principal of Galvez Middle School.[1] Plaintiffs brought this suit pursuant to 42 U.S.C. § 1983 alleging their constitutional rights under the First Amendment, Fourth Amendment, Fourteenth Amendment guarantees of procedural due process and equal protection, and Eighth Amendment had been violated. Plaintiffs also alleged their rights had been

violated under 20 U.S.C. § 1415. After this suit was filed, the defendants filed a motion for summary judgment seeking dismissal of all claims. Defendants argue plaintiffs' claims should be dismissed as a matter of fact and law. Defendants also claim that plaintiffs' claims against the school officials are precluded by qualified immunity. Finally, defendants seek an award of attorneys' fees under 42 U.S.C. § 1988 for fees incurred in defending this suit.

The Court dismissed the equal protection, Eighth Amendment, and 20 U.S.C. § 1415 claims without objection.[2] Plaintiffs conceded in their supplemental brief that Andrew Breen's due process claims and any claims against Linda Wilson, either individually or in her official capacity, were "untenable" and could be dismissed. Plaintiffs also conceded Conrad Braud was the only defendant being sued in his individual capacity.[3] Thus, the only remaining issues before this Court on defendants' motion for summary judgment are whether: (1) material issues of fact exist on Adam Porter's First and Fourth Amendment claims; (2) the evidence shows Ms. LeBlanc or Adam Porter's procedural due process rights under the Fourteenth Amendment were violated; (3) Robert Cloutare and Conrad Braud are liable under 42 U.S.C. § 1983 in their official capacities; (4) Conrad Braud is entitled to assert qualified immunity as a defense in his individual capacity; and (5) defendants are entitled to attorneys' fees under 42 U.S.C. § 1988.

#### B. Factual Background

The facts which precede the filing of this suit are not in dispute.

When Adam was approximately 14 years old, he drew a sketch of East Ascension

---

1. Mary LeBlanc, plaintiffs' mother, filed this suit on behalf of her sons.

2. Rec. Doc. No. 50.

3. Rec. Doc. No. 52 at 3.

High School ("EAHS") in the privacy of his home. The picture showed EAHS being soaked with gasoline surrounded by an individual with a torch and a missile. The drawing also depicted at least two students holding what appeared to be guns and a student throwing a brick at EAHS Principal Conrad Braud, while saying the words, "shut the f—— up faggot." A racially expletive word was also written on the drawing. Adam showed the sketch to three people: Mary LeBlanc, his mother; Andrew Breen, his younger brother, and Kendall Goudeau, a friend who resided with the Porters at the time of the drawing. The sketch pad that contained the drawing was subsequently stored and did not resurface again until approximately two years later.

Two years after the drawing was made, Adam and Andrew were both students in the Ascension Parish school system. Adam attended EAHS and Andrew attended Galvez Middle School. On March 15, 2001, Andrew brought a sketch pad to school containing numerous drawings, including Adam's drawing of EAHS which was described above. While riding home from school on the school bus that day, Andrew allowed a fellow student to see the sketch pad. While reviewing the pad, the student discovered Adam's drawing of EAHS. The student immediately showed Adam's drawing to Diane McCauley, the bus driver and told the driver: "Miss Diane, look, they're going to blow up EAHS." McCauley immediately confiscated the sketch pad. On the following morning, McCauley took the pad to Linda Wilson, the Principal of Galvez Middle School and Myles Bourque, the in-school suspension coordinator. After the school officials saw the drawing, Andrew was called to the office and questioned by Wilson and Bourque. They also searched his book bag.

In response to their questions, Andrew told the school administrators that his brother Adam had drawn the sketch a few years earlier. Andrew was suspended for possessing the drawing on the school campus. Wilson and Bourque immediately brought the picture to EAHS.[4] Defendants contend Wilson felt immediate action was necessary because Andrew had been suspended from school that same year for verbally threatening to kill some of his fellow students. Although Principal Conrad Braud and Assistant Principal Gwynne Pecue were in a meeting on this particular morning, School Resource Officer Robert Rhodes interrupted the meeting to bring Adam's drawing to their attention. Adam was then summoned to the office by the EAHS officials. While being questioned, Adam readily admitted he had drawn the picture. During the meeting, Adam and his book bag were searched. The search revealed notebooks from Adam's book bag that contained references to death, drugs, and sex; gang signals etched on the notebooks; a fake ID; and a razor blade, which can also be described as a box cutter. Plaintiffs set forth several explanations for the items found during the search. Although plaintiffs concede Adam did have the materials found on his person or book bags, they contend the death references were part of a homework assignment. They also claim the gang symbols only referred to a group of young men that Adam hung around with whom Braud did not consider a threat. Finally, plaintiffs state the "razor blade" was allegedly a box cutter used by Adam in his after school job.[5]

Following the search and interview, Braud recommended that Adam be expelled from EAHS and sent to an alternative school. Officer Rhodes read Adam his Miranda rights and arrested him on

4. Rec. Doc. No. 39 at 4.

5. Rec. Doc. No. 43 at 3.

charges of terrorizing and illegal possession of a weapon. Adam's mother, Mary LeBlanc, was called and asked to come to the school. When she arrived, she was told that Adam was being recommended for expulsion and that he also had been arrested. Adam and his mother were allowed to leave the school carrying the written recommendation for expulsion and instructions that Adam was to remain at home until a hearing could be held. No hearing date was immediately set. On March 23, 2001, Ms. LeBlanc voluntarily signed a form waiving Adam's right to an expulsion hearing before the superintendent. Ms. LeBlanc signed the waiver form after discussing the matter with Linda Lamendola, the hearing officer for the Ascension Parish School Board. During the meeting, Adam's mother was advised that these expulsion hearings were regularly decided in the school's favor, and Adam could enroll at the Ascension Parish Alternative School and continue his education if she waived the hearing. Following the meeting, Adam enrolled in the Ascension Parish Alternative School. The defendants also allowed Adam to re-enroll at EAHS in August 2001. He voluntarily dropped out of EAHS in March 2002.

## II. Law and Analysis

### A. Standard for Summary Judgment

Summary judgment should be granted if the record, taken as a whole, "together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." [6] The Supreme Court has interpreted Rule 56(c) to mandate "the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." [7]

If the moving party meets this burden, Rule 56(c) requires the nonmovant to go beyond the pleadings and show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial.[8] The nonmovant's burden may not be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence.[9] Factual controversies are to be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." [10] The substantive law dictates which facts are material.[11] The Court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." [12] Unless there is sufficient evi-

---

**6.** Fed R. Civ. P. 56(c); *Wyatt v. Hunt Plywood Co.,Inc.*, 297 F.3d 405, 408–09 (5th Cir.2002); *New York Life Ins. Co. v. Travelers Ins. Co.*, 92 F.3d 336, 338 (5th Cir.1996); and *Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755, 758 (5th Cir.1996).

**7.** *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *see also Gunaca v. Texas*, 65 F.3d 467, 469 (5th Cir.1995).

**8.** *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1046–47 (5th Cir.1996).

**9.** *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994); and *Wallace, supra* at 1047.

**10.** *Wallace, supra* at 1048 (citations omitted); *see also S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 494 (5th Cir.1996).

**11.** *Canady v. Bossier Parish School Bd.*, 240 F.3d 437, 439 (5th Cir.2001).

**12.** *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995), *as revised on denial of rehearing*, 70 F.3d 26 (5th Cir.1995).

dence for a jury to return a verdict in the nonmovant's favor, there is no genuine issue for trial.[13]

## B. Constitutional Claims

The Court now turns to a discussion of the various constitutional claims asserted by the plaintiffs and the defenses raised by the defendants.

### 1. First Amendment

■ The United States Supreme Court has issued a series of opinions which set forth guidelines the Court and others must follow in regulating student expression in public schools. These cases include *Tinker v. Des Moines Indep. Community School Dist.*,[14] *Bethel School District No. 403 v. Fraser*,[15] and *Hazelwood School District v. Kuhlmeier.*[16] In *Tinker*,[17] the United States Supreme Court found that public school students do not shed their constitutional rights "at the schoolhouse gate,"[18] and held that a public school's refusal to allow its students to wear black armbands to protest the Vietnam War was an unconstitutional denial of the students' First Amendment rights.[19] Because the restrictions and limitations set forth in *Tinker* regulated political content, the level of scrutiny required by the Court was high. The Court noted that unless the challenged expression materially and substantially interfered with the requirements of appropriate discipline in the operation of the school, First Amendment protection should be accorded to students.[20] A material and substantial interference may only be shown by facts which reasonably lead school officials to forecast substantial disruption of or a material interference with school activities.[21] The Supreme Court then decided the *Fraser*[22] case wherein the Court held that the First Amendment did not protect a student's vulgar and sexually provocative speech at a school assembly. The Court found that a student's First Amendment rights "are not coextensive with the rights of adults in other settings."[23] The distinction set forth by the Court in *Fraser* was that the expression in *Fraser* was unrelated to any political viewpoint. Thus, the Court found the expression was entitled to lesser constitutional scrutiny than the *Tinker* plaintiffs received. Finally, in *Kuhlmeier*,[24] the Court held that school newspaper articles dealing with controversial topics may be censored by school officials. The Court found that "the determination of what manner of speech in the classroom or in school assembly is inappropriate properly

13. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) ("...there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.").

14. 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).

15. 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986).

16. 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988).

17. *Tinker, supra.*

18. *Id.* at 506, 89 S.Ct. at 736.

19. *Id.* at 514, 89 S.Ct. at 740.

20. *Id.* at 509, 89 S.Ct. at 738 ("Certainly where there is no finding and no showing that engaging in the conduct would 'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school,' the prohibition cannot be sustained.") (citation omitted).

21. *Id.* at 514, 89 S.Ct. at 740. *See also Shanley v. Northeast Independent School Dist.*, 462 F.2d 960, 970 (5th Cir.1972).

22. *Fraser, supra.*

23. *Id.* at 682, 106 S.Ct. at 3164.

24. *Kuhlmeier, supra.*

rests with the school board, rather than with the federal courts." [25] *Kuhlmeier* differed from *Tinker* in that the challenged expression came from a school sponsored publication and justified a lower standard for upholding student expression than the standard applied in *Tinker*.

■ In the case now pending before the Court, this Court must determine whether First Amendment protection should be given to a student who brings a graphic and violent drawing to school that depicts a public school being soaked with gasoline, while a missile is aimed at it, with obscene and racial expletives written on the drawing, and students holding guns and throwing a brick at the principal. In determining whether this drawing is entitled to the First Amendment protections claimed by the plaintiff, it is necessary to review certain events which preceded the defendants' actions. Prior to and during the period involved, school officials, students and parents were exposed to horrific news stories depicting students who went on shooting rampages and committed other acts of violence on school campuses. The most notable story was the attack at Columbine High School in April 1999, where a tragic shooting occurred resulting in many deaths and injuries. Many news organizations reported the large number of guns and other violent weapons being brought to school and the other acts of violence and disruptions in schools around the country. Similar acts were reported on school buses. Some schools became like war zones, and metal detectors and police officers became commonplace on high school campuses throughout the United States. Parents were justifiably concerned about the safety of their children at school and on school buses. School officials were trying to maintain an environment for students to learn while also implementing appropriate security measures. Plaintiffs have argued throughout their briefs that this Court should not consider Columbine and other similar incidents in determining the reasonableness of Ascension Parish school officials' behavior. However, school officials cannot operate in a vacuum or in a fantasy world and must be aware of the events occurring at other schools to properly protect their students and faculty. One of the keys to avoiding violence and disruption at schools is to be aware of acts which could cause such. Indeed, several of the opinions this Court relies on in this opinion mention Columbine and similar incidents in upholding the actions taken by the schools in other cases. A clear example of this is the opinion rendered in *LaVine v. Blaine School Dist.*,[26] wherein the Court stated:

> "[W]e live in a time when school violence is an unfortunate reality that educators must confront on an all too frequent basis. The recent spate of school shootings have put our nation on edge and have focused attention on what school officials, law enforcement and others can do or could have done to prevent these kinds of tragedies. After Columbine, Thurston, Santee and other school shootings, questions have been asked about how many teachers or administrators could have missed telltale 'warning signs,' why something was not done earlier and what should be done to prevent such tragedies from happening again." [27]

It is against this backdrop that this Court must now decide if Adam Porter's drawing is entitled to First Amendment protection.

In resolving the First Amendment claim, this Court must first decide the standard that should be applied under the facts of

---

**25.** *Id.* at 267, 108 S.Ct. at 567–68.

**26.** 257 F.3d 981 (9th Cir.2001)

**27.** *Id.* at 987.

this case in making this determination. The Court has several options available in determining if Adam's drawing constitutes student speech which is entitled to First Amendment protection. The Court may use the *Tinker* standard and determine if the speech "materially and substantially interferes with the requirements of appropriate discipline in the operation of [public schools]."[28] A second approach would permit the Court to determine if the speech constitutes a "true threat" and is precluded from any First Amendment protection at all.[29] The third approach is to follow a standard established by the Fifth Circuit Court of Appeals which rejects applying *Tinker* to viewpoint neutral speech that just happens to occur on campus. The Court will briefly discuss each of these standards.

The Ninth Circuit's decision in *LaVine*[30] illustrates the pure-*Tinker* approach. In *LaVine*, a high school student showed a poem that he had written to his teacher. The poem was a story about a student killing himself after being unable to deal with the fact he had killed his fellow classmates two years earlier. The poem, which had been written at home and was not a school assignment, disturbed the teacher because this particular student had prior behavioral problems. Therefore, the teacher took the poem to the principal. Thereafter, the student was expelled.[31] The student and his father then filed suit in federal court claiming the student's constitutional rights, including those under the First Amendment, had been violated. The Ninth Circuit affirmed the district court's decision which granted a partial summary judgment on the First Amendment claims.[32]

In dismissing some of the First Amendment claims, the Ninth Circuit applied the standard set forth in *Tinker* because the speech in question was neither lewd and offensive or school sponsored. Under this approach, which the Court will refer to as the pure-*Tinker* approach, *Tinker* is used on any First Amendment claim in which *Fraser* or *Kuhlmeier* is not implicated. Using this standard, the Ninth Circuit held the student's poem would not be entitled to First Amendment protection if the school could justify its decision by showing facts that might reasonably lead school authorities to forecast a substantial disruption of or material interference with school activities.[33] The Court then found it would have been reasonable for school officials to forecast a substantial disruption based on the totality of the facts—the student's past behavioral problems and suicidal tendencies, the violent imagery of the poem, the special circumstances of the school environment, and the recent school shootings in the news.[34]

The decision rendered in *Demers v. Leominster School Dept.*[35] illustrates the second approach. In *Demers,* an eighth grade student with a history of disruptive behavior and substance abuse was expelled for drawing two pictures during school—one of the school surrounded by explosives, with students hanging out of the window crying for help and the other of the Superintendent of Schools with a gun pointed at his head and explosives at his feet. The student had also written on a

---

**28.** *Tinker, supra* at 509, 89 S.Ct. at 738.

**29.** See *Watts v. United States,* 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969).

**30.** *LaVine, supra.*

**31.** *Id.* at 984–85.

**32.** *Id.* at 986.

**33.** *Id.* at 989.

**34.** *Id.* at 989–90.

**35.** 263 F.Supp.2d 195 (D.Mass.2003).

separate sheet of paper that he wanted to die and hated life.[36] In determining if the drawings were entitled to First Amendment protection, the district court followed *LaVine*, but first used *Tinker* as the default standard. Under the *Tinker* standard, the Court held the drawings could reasonably be interpreted as a potential disruption or interference with public schools, and First Amendment protection was precluded.[37] However, the Court also applied the traditional "true threat" standard enumerated in *Watts v. United States*.[38] The Court found that the true threat inquiry was necessary because if a reasonable person would interpret the alleged threat as a serious expression of an intent to cause a present or future harm, then the speech would not be entitled to First Amendment protection. The Court concluded the expression would constitute a threat, not speech.[39] The Court also found this student's drawing was not entitled to First Amendment protection under the true threat doctrine because his drawing and note would have reasonably been considered a threat to both the school and himself.[40]

The final approach that can be used in these First Amendment cases comes from the Fifth Circuit's decision in *Canady v. Bossier Parish School Bd.*[41] In *Canady*, the Court had to determine what level of scrutiny to apply to a First Amendment attack on a compulsory public school uniform policy. The Fifth Circuit rejected *Tinker* as being the default standard whenever challenged student speech is not lewd and offensive or school sponsored.

Instead, the Fifth Circuit said that the level of scrutiny applied to regulate student expression depends on the substance of the message, the purpose of the regulation, and the manner in which the message is conveyed.[42] The Court identified three categories of student speech regulations: (1) school regulations which are governed by *Tinker*; (2) lewd, vulgar, obscene, or plainly offensive speech which is governed by *Fraser*; and (3) expression related to school sponsored activities which is governed by *Kuhlmeier*.[43] The Fifth Circuit then acknowledged the views of the Seventh, Eighth and Ninth Circuits that the *Tinker* standard should be the default standard whenever the challenged speech does not fall into any of these particular categories. However, the *Canady* court declined to apply such a standard and held the *Tinker* standard "[did] not account for regulations that are completely viewpoint-neutral."[44] The Fifth Circuit held that when the expression was viewpoint-neutral personal expression that just happened to occur on campus, the applicable level of scrutiny was higher than *Kuhlmeier*, but less stringent than the school official's burden in *Tinker*. Where none of the traditional categories applied, the Fifth Circuit said the more appropriate standard was to combine the traditional time, place, and manner analysis with the test enumerated in *United States v. O'Brien*.[45] Under this approach, whenever student expression is viewpoint neutral speech that just happens to occur on campus, the school's reaction will pass constitutional scrutiny "if it fur-

---

36. *Demers, supra* at 198–99.

37. *Id.* at 203.

38. *Watts, supra.*

39. *Demers, supra* at 201–02.

40. *Id.* at 202.

41. *Canady, supra.*

42. *Id.* at 441.

43. *Id.* at 442.

44. *Id.* at 443.

45. 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

thers an important or substantial government interest; if the interest is unrelated to the suppression of student expression; and if the incidental restrictions on First Amendment activities are no more than is necessary to facilitate that interest." [46]

Neither the Supreme Court nor the Fifth Circuit have specifically addressed whether drawings such as that drawn by Adam in this case are entitled to First Amendment protection. Therefore, the Court will use all three of the standards set forth above to determine if Adam's drawing is entitled to First Amendment protection. It can hardly be said that Adam's drawing was a political expression which is protected by the First Amendment. Thus, Adam's drawing is not entitled to First Amendment protection under a pure-*Tinker* standard. Therefore, the Court finds that the drawing "materially and substantially interferes with the requirements of appropriate discipline in the operation of [public schools]." [47] There were also specific facts available that made it reasonable and indeed prudent for school officials to forecast a substantial disruption or material interference with school activities considering the nature of the drawing and similar events at other schools that had resulted in tragic outcomes or disrupted the educational environment at schools. In fact, the drawing did cause a substantial disruption at two schools in Ascension Parish. Authorities at Galvez Middle School had to handle a disruption on Diane McCauley's school bus because a young girl had yelled EAHS was going to be burned down. This disruption continued at the school when Andrew Breen was called into the office and administrators had to suspend him. The school officials were justified and showed sound judgment for being concerned for the safety of the students, staff and school property. These facts clearly support the school's decision to search Andrew's school book bag. There were also disruptions and potential dangers at EAHS because of the discovery of the drawing. Officials interrupted a meeting of EAHS administrators because they believed immediate action was necessary to decide how to handle the problems associated with Adam's drawing. The administrators held a meeting with Adam and his mother. It is also clear that Adam's mother knowingly and voluntarily waived a formal hearing. School officials also examined the drawing and conducted a search of Adam and his locker to protect the staff, students, faculty and facilities at EAHS. This search turned up a box cutter which was found in Adam's wallet. After considering all of the factors a reasonable school official would and should consider under the circumstances, the administrators decided to expel Adam from EAHS and place him in an alternative school. The concerns of the Ascension Parish school officials and their subsequent actions are analogous to the actions taken by the administrators in *LaVine* and *Demers* where both Courts found that no First Amendment violations had occurred. After reviewing the facts and circumstances of this case and the jurisprudence, this Court concludes that no First Amendment protection is or should be available to plaintiffs under a pure-*Tinker* standard.

Using the factors set forth in *Watts*,[48] this Court must determine if Adam's drawing constituted a "true threat" to the faculty, students and facilities at EAHS. Threats of violence are types of speech that the government can proscribe without offending the First Amendment because

---

**46.** *Canady, supra* at 443.

**47.** *Tinker, supra* at 509, 89 S.Ct. at 738.

**48.** *Watts, supra.*

the government has an overriding interest and indeed an obligation to protect individuals from the fear that such violence may occur.[49] In the briefs submitted to the Court, both parties discussed *Doe v. Pulaski County Special School Dist.*,[50] an Eighth Circuit case that discussed the true threat doctrine in the context of public schools. In *Doe*, a junior-high student wrote two violent and obscenity-laden rap songs in which he expressed a desire to molest, rape, and murder his ex-girlfriend. The songs were prepared at the student's home, and he later showed them to one of his friends. The student had also discussed the contents of the song with his ex-girlfriend. The friend removed the songs from the student's room without the student's permission and delivered them to the ex-girlfriend. The songs were turned over to school authorities who then expelled the student.[51] In determining whether the songs constituted a true threat, the Eighth Circuit held the songs to the standard of whether a reasonable recipient would have interpreted the speech as a serious expression of an intent to harm or cause injury to another.[52] The Court set forth a nonexhaustive list of factors which are relevant for the Court to consider in determining whether a reasonable recipient would have viewed the purported threat: (1) the reaction of those who heard the alleged threat; (2) whether the threat was conditional; (3) whether the person who made the alleged threat communicated it directly to the object of the threat; (4) whether the speaker had a history of making threats against the person purportedly threatened; and (5) whether the recipient had a reason to believe the speaker had a propensity to engage in violence.[53] Applying the above standard, the Eighth Circuit found the student's drawing was not entitled to First Amendment protection because it was a true threat. The factors the Court found and relied on were that the student willingly showed the letter to his friend and discussed its contents with the ex-girlfriend; both the friend and ex-girlfriend were extremely frightened by the contents of the letter; and the student had a past history of violence.[54]

Viewing the entire factual circumstances surrounding Adam's drawing, it was reasonable, and in this Court's opinion necessary and proper, for Ascension Parish school officials to view Adam's drawing as a true threat to the EAHS school students, faculty and facilities. A careful review of the drawing and language contained on the drawing reveals that it was reasonable for the recipients of Adam's drawing to interpret it as a serious expression of an intent to harm and cause injury or even death to others or to cause damage to the school's facilities. The drawing resulted in serious expressions of fear and concern by its recipients which included both students, administrators and a bus driver. Administrators at Galvez Middle School and EAHS said they were seriously concerned for the welfare of their other students. They were justified in having this concern. The seriousness of the threat is illustrated by the immediate response school officials from two different schools gave to Adam's drawing. Further, both Adam's and Andrew's past disciplinary records made it reasonable for school officials to believe a

49. *Watts, supra* at 707, 89 S.Ct. at 1401; *R.A.V. v. City of St. Paul, Minnesota*, 505 U.S. 377, 388, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992); *Shackelford v. Shirley*, 948 F.2d 935, 938 (5th Cir.1991).

50. 306 F.3d 616 (8th Cir.2002).

51. *Id.* at 619–20.

52. *Id.* at 624.

53. *Id.* at 623.

54. *Id.* at 625–27.

serious situation did exist and both students were capable of carrying out the threats depicted on the drawing. It is of no consequence that Adam may not have intended for the drawing to end up in the school administrator's hands or a student's hands. The fact that a box cutter was found in Adam's wallet only adds further support for the action taken by the school administrators. The Court believes the school administrators were justified in treating the box cutter as a dangerous weapon.[55] Plaintiffs seek to distinguish this case from *Doe* by arguing that Adam did not intentionally disclose his drawing to anyone else. This does not and should not matter. What does matter is that the drawing did end up in the hands of a student, a bus driver and school administrators, all of whom were justified in believing it was a threat to the safety of all of the EAHS school family and facilities.[56] It is totally unreasonable for Adam, his brother and his mother to believe that this drawing would not cause the school administrators and students to react as they did. The Eighth Circuit made it clear in *Pulaski* that the factors set forth in that opinion were nonexhaustive. However, the factors set forth in *Pulaski* and those found by the Court to be present in this case support a finding that the recipients of Adam's drawing reasonably perceived it as a threat and were justified in concluding that Adam and his brother were capable of carrying out the threat. Therefore, the Court concludes that Adam's drawing was a true threat of an intent to harm or cause injury to others or school property and is not entitled to First Amendment protection.

Under the Fifth Circuit approach, this Court must now determine (1) whether the school's suppression of Adam's speech furthers an important or substantial government interest; (2) the interest is unrelated to the suppression of student expression, and, (3) the incidental restrictions on First Amendment activities are no more than is necessary to facilitate that interest.[57] In *Canady*, the Fifth Circuit upheld a mandatory school uniform policy because the government's interest in improving the educational process outweighed the students' First Amendment interest. The Court said that school uniform policies had been shown to decrease discipline problems and improve test scores.[58] The Court further justified its deference to school officials relying on Supreme Court precedent which holds that it is not the job of federal courts to determine the most effective way to educate our nation's youth.[59] In Adam's case, the school's interest is even greater. The safety of the children who attend our schools is one of the most important responsibilities that school officials have. Even the best planned educational process will fail if school administrators cannot ensure the safety of its students and facilities. Further, this responsibility is even greater today because of the horrific shooting incidents and other acts of violence which have occurred at schools in the United States and elsewhere in recent times. Since the Fifth Circuit has upheld a school uniform policy against a First Amendment attack, this Court has strong

---

55. The Court cannot overlook the fact that box cutters were used by the terrorists who hijacked the planes that crashed into the World Trade Center, the Pentagon and in a field in Pennsylvania on September 11, 2001.

56. Both of the schools involved in this case should be grateful for the action taken by the student and bus driver who had the courage to report the nature of the drawing to school officials.

57. *Canady, supra* at 443.

58. *Id.*

59. *Id.* at 444 *citing Kuhlmeier, supra.*

belief that drawings like Adam's should not receive First Amendment protection under the facts of this case. For school officials to ignore the potential or actual danger exhibited by the facts surrounding Adam's drawing and subsequent search would have been a gross violation of a duty school administrators have to protect their students and facilities. Where as here, there are facts which fully support the actions of the school administrators, the federal courts should not second guess school officials and interfere with the role of the administrators to properly discipline, protect and educate students.

█ Finally, plaintiffs have repeatedly argued that because Adam's drawing was done in the privacy of his own home, it is off-campus expression that school officials have no right to regulate. This contention is totally without merit. The Court has little doubt that bringing a gun from home and using it as a threat at school would not be sanctioned because the gun was loaded at home. The same can be said of the drawing. The key issue is whether the school administrators and students perceived the drawing (or gun) as a threat to their safety and security when it was discovered on the school campus or bus. The speech in *Doe* and *LaVine* were both conducted off-campus, but these Courts still approved the regulation because the drawings ultimately ended up in the hands of school administrators. The action taken in *Doe* was approved where the songs ended up with school officials even though the student clearly had no intent for his songs to leave his room or ever be seen by others. Adam's intent is also immaterial. It is material that his drawing ended up on a school bus and caused a danger and

threat to school property, students and faculty or otherwise disrupted the education of students at two schools. Where off-campus expression leads to an interference and disruption of on-campus activities, as was done in this case, this Court cannot and should not afford such expression First Amendment protection or second-guess the action school officials take to protect their students and facilities. Indeed, the Court should give full support and approval to the actions of school administrators who take appropriate action, as was done in this case, to protect and educate their students in a disciplined environment that is safe and conducive for learning.

### 2. Fourth Amendment

█ The Court now turns to a discussion of plaintiffs' Fourth Amendment claims. The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." [60] In Fourth Amendment cases, courts must determine whether a search or seizure is reasonable under all the facts and circumstances of a particular governmental invasion of a person's personal security. [61] In *New Jersey v. T.L.O.*, [62] the United States Supreme Court held the Fourth Amendment's prohibition on unreasonable searches and seizures does apply to searches conducted by public school officials. [63] The standard required when a public school official wants to search the person of a student is reasonableness under the circumstances and not probable cause. Reasonableness in the public school setting is determined by balancing the student's

---

**60.** *Milligan v. City of Slidell*, 226 F.3d 652, 654 (5th Cir.2000) (*citing Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and U.S. Const., amend. IV).

**61.** *Milligan, supra* at 654.

**62.** 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985).

**63.** *Id.* at 333, 105 S.Ct. at 738.

legitimate expectation of privacy against the school's legitimate need to maintain an environment in which learning can take place.[64] When defining this balancing exercise, the Supreme Court realized the extreme importance of maintaining order in the public school setting, stating:

> Against the child's interest in privacy must be set the substantial interest of teachers and administrators in maintaining discipline in the classroom and on school grounds. Maintaining order in the classroom has never been easy, but in recent years, school disorder has often taken particularly ugly forms: drug use and violent crime in the schools have become major social problems...Even in schools that have been spared the most severe disciplinary problems, the preservation of order and a proper educational environment requires close supervision of schoolchildren, as well as the enforcement of rules against conduct that would be perfectly permissible if undertaken by an adult.[65]

Determining the reasonableness of a school official's actions involves a two-part inquiry: (1) whether the action was justified at its inception; and (2) whether the actual search was reasonably related in scope to the interference that justified the interference in the first place. A search is justified at its inception when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or a school rule.[66]

The Supreme Court also addressed Fourth Amendment issues in the public school context in *Vernonia School Dist. 47J v. Acton*,[67] which upheld a mandatory drug testing policy for high school athletes. Justice Scalia, writing for the Court, recognized the important interest of maintaining order in public schools and reasoned the public school setting contained "special needs" that justified lessening traditional Fourth Amendment requirements.[68] Because these special needs existed, the Supreme Court held that "the 'reasonableness' inquiry cannot disregard the schools' custodial and tutelary responsibility for children," and thus, "students within the school environment have a lesser expectation of privacy than members of the population generally." [69]

Courts applying these Supreme Court cases often defer to the school's decision in Fourth Amendment cases. In *T.L.O.*, the Supreme Court held reasonable suspicion existed to search a student's purse, its inner compartments, and to read two letters and index card that revealed the student's drug-dealing habits whenever the student had been caught smoking in the bathroom.[70] Similarly, in *Hassan v. Lubbock Independent School Dist.*,[71] the Fifth Circuit granted summary judgment on a student's Fourth Amendment claim where the student had been detained on a school field trip to a prison for failure to behave.[72] Citing *T.L.O.* and "the unique backdrop that schools present for the operation of the Fourth Amendment," the Court said "the reasonableness of seizures must be determined in light of all circumstances, with particular attention being paid to whether the seizure was justified at its

---

64. *Id.* at 340, 105 S.Ct. at 742.

65. *Id.* at 339, 105 S.Ct. at 741.

66. *Id.* at 341–42, 105 S.Ct. at 742–43.

67. 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995).

68. *Id.* at 653, 115 S.Ct. at 2391.

69. *Id.* at 656–57, 115 S.Ct. at 2392.

70. *T.L.O., supra* at 328, 347, 735–36, 746.

71. 55 F.3d 1075 (5th Cir.1995).

72. *Id.* at 1082.

inception and reasonable in scope." [73] Finally, in *Milligan v. City of Slidell,*[74] administrators at Slidell High School and police officers called students from class to question them about rumors that a possible fight on school premises was going to occur. Some of the students filed suit against the city arguing their Fourth Amendment rights had been violated.[75] The Fifth Circuit reversed the decision of the Eastern District of Louisiana which had ruled in the students' favor.[76] Citing *Vernonia,* the Fifth Circuit held that the school's compelling governmental interest outweighed the students' Fourth Amendment rights. The Court characterized this compelling government interest as including student protection, fostering self-discipline, and the deterrence of possible violent misconduct. The Court also noted a temporal concern and considered whether immediate response was necessary and warranted. The Court found the school's response was indeed needed due to the imminent threat of an on-campus disturbance.[77]

In addition to the cases set forth above, the parties have discussed two additional cases in their briefs. In *Cuesta v. School Bd. of Miami–Dade County, Fla.,*[78] nine high school students created and distributed an anonymous pamphlet on school grounds which featured a graphic picture of the school principal with a dart through his head. The pamphlet also contained an essay that "wondered what would happen

if he shot the principal." [79] In response, the principal called the students to his office and had them arrested. The students were later booked and strip-searched at a correctional facility.[80] The court held the students' Fourth Amendment rights were not violated by the school board or the police officers because "reasonable suspicion" existed based on the "violent and threatening language and imagery contained in the pamphlet." [81] The Eleventh Circuit concluded that violent drawings accompanied by threatening words aimed at the school is sufficient to create reasonable suspicion that the student may intend to harm the school. Thus, the court found that a search under such circumstances was deemed reasonable under the Fourth Amendment.

A similar result was reached in *Stockton v. City of Freeport, Texas.*[82] In *Stockton,* a threatening letter was found in a high school computer room three days after the Columbine incident. The school did not know who wrote the letter, but suspected it was one of several students who congregated at a group of picnic tables on campus.[83] In response, fourteen students were frisked, handcuffed and led from school to the municipal building.[84] Later, the students were exonerated of all charges by the school principal in front of the student body.[85] The students then filed suit against the school for violating their Fourth Amendment rights. The Court granted the school's motion to dis-

---

73. *Id.* at 1079.

74. *Milligan, supra.*

75. *Id.* at 653.

76. *Id.* at 654, 656.

77. *Id.* at 655.

78. 285 F.3d 962 (11th Cir.2002).

79. *Id.* at 965.

80. *Id.* at 965–66.

81. *Id.* at 969.

82. 147 F.Supp.2d 642 (S.D.Tex.2001).

83. *Id.* at 644.

84. *Id.* at 643.

85. *Id.* at 644.

miss because "the rights asserted by [the students], although legitimate and substantial, [did] not outweigh the School's dramatically compelling interests in maintaining a safe place of learning."[86] Thus, the *Stockton* court, like *Milligan,* considered the temporal factor and concluded an immediate response in this situation was both crucial and warranted.[87]

█ Under these cases, the reasonableness of the actions taken by school officials in the public school setting is usually resolved in favor of the school. When school personnel or students are threatened by a student's expression, the deference given school officials in the Fourth Amendment context is even greater. Plaintiffs have not submitted any evidence to convince this Court that it should depart from the holdings of these cases. Defendants acted properly and reasonably in searching Adam under the facts of this case. His drawing graphically illustrated what EAHS would look like if it were under siege. The profane language further indicated that this student was not pleased with EAHS and its principal and had a distinct racial bias against some of its students. Ascension Parish school officials (and the student and bus driver who discovered the drawing) were totally reasonable in believing that Adam posed an immediate danger to the faculty, students and facilities of EAHS. The search of Adam's person and book bag was necessary, justified, and clearly permitted under the cases cited above. The facts submitted with the motion for summary judgment clearly support a finding of reason-

ableness. Thus, defendants are entitled to summary judgment as a matter of law on plaintiff's Fourth Amendment claims under the undisputed facts of this case. The Court's decision is fully supported by the Fifth Circuit's decision in *Milligan* wherein the Court stated:

> [I]t should be clear that the privacy right asserted does not outweigh the school's interests. Students in the school environment have a lesser expectation of privacy than the general population. Teachers and administrators control their movements from the moment they arrive at school; for example, students cannot simply walk out of a classroom. Nor can they walk out of a principal's or vice-principal's office in the middle of any official conference. Students at school thus have a significantly lesser expectation in regard to the temporary "seizure" of their persons than does the general population.[88]

*3. Procedural Due Process*

The plaintiffs have also asserted a due process claim. The Due Process Clause prohibits the state from depriving a person of life, liberty, or property without due process of law. In any procedural due process claim, the initial inquiry should always be whether a property interest or right exists.[89] In *Goss v. Lopez,*[90] the United States Supreme Court held that students have a protected property interest in education that required minimum due process protections before disciplinary sanctions could be imposed.[91] Thus, Adam had a protected property interest in his

**86.** *Id.* at 647. "It is difficult to conceive of a scenario in which greater governmental interest is invoked than the threat of indiscriminate violence at school...Indeed, officials in the Columbine massacre were harshly criticized for failing to take action regarding prior signs of problems." *Id.* at 646.

**87.** *Id.*

**88.** *Milligan, supra* at 655–56.

**89.** *See Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

**90.** 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975).

**91.** *Id.* at 573, 95 S.Ct. at 736.

education, which means he could not have been expelled without due process of law. The extent of due process required is also a relevant factor that must be resolved by the Court. In *Goss,* the Court held students facing a ten-day suspension must be given some kind of notice and afforded some type of hearing.[92] The Court stated the hearing could be held immediately following the incident and be informal. However, the Supreme Court did caution "suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures."[93] Considering these guidelines, Adam was entitled to a hearing since he was removed from EAHS and sent to an alternative school. The nature of and the extent of the due process hearing afforded Adam is not an issue on this summary judgment motion under the facts of this case. Instead, this Court must determine whether Adam was entitled to any due process hearing at all since he freely and voluntarily admitted the charges against him and his mother knowingly and voluntarily waived Adam's right to an expulsion hearing.

■ To establish a denial of procedural due process, a student must show substantial prejudice from an inadequate procedure.[94] In *Keough v. Tate County Bd. of Educ.,*[95] the Fifth Circuit held where a student admitted the charges against him and was suspended, such an admission of guilt and truth of the charges precluded a procedural due process claim, even if a due process violation had in fact occurred.[96] The Court reasoned that since the student had admitted he committed the charged conduct and had knowledge that his conduct violated school rules, there was substantial evidence to support a finding that the student was guilty. Thus, no procedural due process violation had occurred.[97]

Other circuits follow the Fifth Circuit rule and have also held there is no procedural due process violation when the student admits the violation. In *Watson ex rel. Watson v. Beckel,*[98] the Tenth Circuit concluded that where a military student admitted he assaulted his roommate and was expelled, the student's claim for procedural due process due to lack of notice failed because additional notice would not have allowed him to better defend his claim.[99] In *Black Coalition v. Portland School Dist. No. 1,*[100] the Ninth Circuit found certain portions of a school district's disciplinary grounds unconstitutional on procedural due process grounds. However, the Court declined to order a new hearing because the student had "admitted all of the essential facts which it is the purpose of a due process hearing to establish."[101] Similarly, in *Betts v. Bd. of Educ. of the City of Chicago,*[102] the Seventh Circuit held that where the student unequivocally admitted to activating false fire alarms, the "function of procedural protections in insuring a fair and reliable determination of the retrospective factual

---

92. *Id.* at 579, 95 S.Ct. at 738.

93. *Id.* at 584, 95 S.Ct. at 742.

94. *Keough v. Tate County Bd. of Educ.,* 748 F.2d 1077, 1083 (5th Cir.1984) *citing U.S. Pipe & Foundry v. Webb,* 595 F.2d 264, 274 (5th Cir.1979) and *Arthur Murray Studio of Washington, Inc. v. Federal Trade Commission,* 458 F.2d 622, 624 (5th Cir.1972).

95. *Keough, supra.*

96. *Id.* at 1083.

97. *Id.*

98. 242 F.3d 1237 (10th Cir.2001).

99. *Id.* at 1242.

100. 484 F.2d 1040 (9th Cir.1973).

101. *Id.* at 1045.

102. 466 F.2d 629 (7th Cir.1972).

question...is not essential." [103] The Court acknowledged that while a further process hearing may be required under certain circumstances in the penalty phase even when the offense is admitted, the meeting held between the parents and school administrators was sufficient to satisfy this requirement.[104] Finally, in *Farrell v. Joel*,[105] the Second Circuit held a suspension hearing was not entitled to a procedural due process claim where the student admitted the conduct and knowledge of the violation.[106] Federal district courts have followed the precedent set by the circuit courts and held that procedural due process violations do not occur when the student admits the conduct that led to the sanction.[107]

▌ Following the precedents set forth above, it is clear that procedural due process requirements are less stringent when the student admits the conduct which forms the basis for imposing a sanction on the student. Plaintiffs argue Adam admitted he drew the picture, but did not admit to doing anything wrong. Such an argument is totally frivolous and nothing more than an exercise in semantics. Not only should the subject matter of the drawing put a student such as plaintiff on notice that this was a clear violation of student rules and could cause fear among the faculty and students, but it could also interrupt and impede the school's educational process. However, the drawing was not the only violation found. Adam also had an illegal weapon in his wallet which is also a violation of school rules. The subject matter of the drawing combined with the discovery of a weapon on the person of the student and his admission in the presence of his mother eliminate any need for a more detailed hearing than plaintiff received at the conference which was held in this case. The Court also cannot overlook the fact that it has already held the drawing was not protected by the First Amendment. Considering the jurisprudence and the undisputed facts of this case, including Adam's admission, the discovery of the box cutter and the mother's voluntary waiver of a hearing, plaintiffs were afforded adequate procedural due process. Therefore, summary judgment should be granted on the procedural due process claim.

▌ The Court will also determine whether Adam was denied due process by the Ascension Parish School Board because his mother waived the hearing on Adam's behalf. In *Coplin v. Conejo Valley Unified School Dist.*,[108] the Court held the procedural due process requirements for a student who was expelled for sexual harassment were satisfied where his parents had waived the right to a hearing.[109] The Court relied on the standard set forth by the United States Supreme Court in *D.H. Overmyer Co. v. Frick Co.*[110] and

---

**103.** *Id.* at 633.

**104.** *Id.* at 631, 633.

**105.** 437 F.2d 160 (2nd Cir.1971).

**106.** *Id.* at 163.

**107.** *See Hill v. Rankin County, Miss. School Dist.*, 843 F.Supp. 1112, 1118–19 (S.D.Miss.1993)(Cited *Keough* to conclude that where student admitted the violation, an indefinite suspension was not the result of a procedural due process violation.); and *Watson, supra* at 1242 *citing, inter alia, Boster v. Philpot*, 645 F.Supp. 798, 804 (D.Kan.

1986)("...even if procedure was inadequate, 'the students would still be unable to show that they suffered any prejudice so as to establish a denial of due process. By admitting their guilt, the plaintiffs waived their right to a hearing.' ").

**108.** 903 F.Supp. 1377 (C.D.Cal.1995).

**109.** *Id.* at 1385.

**110.** 405 U.S. 174, 92 S.Ct. 775, 31 L.Ed.2d 124 (1972).

595

concluded that parents may waive their child's constitutional procedural due process right if it is established by clear and convincing evidence that the waiver is voluntary, and knowing and intelligent.[111] The *Coplin* Court found the student's parents' waiver was voluntary, knowing, intelligent, and non-coercive because it was based on "a rational decision to sign the Consent to Discipline Form after evaluating the potential repercussions of not doing so." [112] These repercussions would have included "more serious and adverse consequences" such as their son not being able to graduate with his classmates or having to pay private school tuition.[113]

This Court adopts the persuasive and well reasoned analysis in *Coplin* to support its conclusion that Adam's mother's decision to waive the hearing on his behalf was "voluntary, knowing, intelligent, and non-coercive." [114] The waiver signed by Adam's mother contained language that clearly advised her that Adam had a right to a hearing. Thus, the language which preceded her signature stated:

I understand that although I have a right to a hearing I choose at this time to allow my son/daughter to be transferred to the Ascension Parish Alternative School.[115]

Further, there is no evidence that Adam's mother was misled by Linda Lamendola when she signed the waiver. Thus, Ms. LeBlanc testified in her deposition as follows:

Q. But you understand, though that you waived your right to contest the expulsion.

A. Right.

Q. You understand that right?

A. Right.

Q. And you opted for the alternative school for Adam?

A. I didn't consider I had any other option. They told me that if Adam went to alternative school and finished the alternative school, that he wouldn't be expelled.[116]

It is obvious that Ms. LeBlanc was concerned with the serious and adverse consequences of the charge and the possible sanctions when she waived Adam's expulsion hearing. She was also interested in getting Adam into the alternative school to avoid any gaps in his education. It is also clear that the defendants were concerned about Adam's continued education by its decision to place Adam in an alternative school rather than expel him from the school system. Thus, Ms. LeBlanc evaluated the potential repercussions of not placing Adam in the alternative school and made a knowing, rational decision to waive the expulsion hearing to avoid any further delay in Adam's education. This waiver was voluntary, knowing, intelligent, and non-coercive with full awareness of the consequences. Under these facts and the jurisprudence discussed above, there was no procedural due process violation because Ms. LeBlanc waived the hearing on behalf of her son.

## C. *Qualified Immunity*

The defendants assert qualified immunity as a special defense. Although the Court has found no merit to plaintiffs'

111. *Coplin, supra* at 1383–84 *citing D.H. Overmyer, supra* at 185, 187, 92 S.Ct. 775.

112. *Id.* at 1384. The Court also based its waiver analysis on the fact that the parents were consulting an attorney. Ms. LeBlanc was being advised by an attorney whenever she waived Adam's expulsion hearing.

113. *Id.*

114. *Coplin, supra* at 1383–84 *citing D.H. Overmyer, supra* at 185, 187, 92 S.Ct. 775.

115. Rec. Doc. No. 43, Exhibit 4.

116. Rec. Doc. No. 43, Exhibit 3.

constitutional claims, the Court believes it should also consider the merits of the qualified immunity defense. School officials are entitled to qualified immunity from liability for damages arising under section 1983.[117] The United States Supreme Court approved the qualified immunity defense in 1975 fearing the most capable candidates for school board positions would be deterred from serving if their day to day actions were subjected to the heavy burden of potential personal liability for violating students' constitutional rights.[118] The defendants claim that Principal Conrad Braud is entitled to qualified immunity in his individual capacity. Defendants further claim that Superintendent Robert Cloutare and Principal Conrad Braud cannot be liable in their official capacities under section 1983 since plaintiffs have not submitted any evidence which established that the alleged deprivation of Adam Porter's constitutional rights was related to a policy or custom.

### 1. Whether Conrad Braud is entitled to qualified immunity in his individual capacity

Qualified-immunity protects officials from section 1983 liability provided their conduct does not violate clearly established statutory or constitutional rights which a reasonable person would have known.[119] When determining if a person acting in his personal capacity is entitled to qualified immunity, the inquiry involves a two step analysis. First, courts must determine whether the plaintiff has alleged a violation of a clearly established right. If the plaintiff has sufficiently alleged a violation of a clearly established right, the court must then determine whether the defendant's acts were objectively reasonable in light of the clearly established law at the time the defendant acted.[120] Once the court determines the official's conduct does not violate a clearly established statutory or constitutional right which a reasonable person would have known, then qualified immunity acts as a complete defense to the lawsuit. It is unnecessary for courts to reach the second prong of the qualified immunity test if the plaintiff fails to submit the requisite summary judgment evidence that the individual defendant violated a clearly established constitutional right.[121]

Because this Court has determined that none of Adam's constitutional rights were violated, the Court is not required to reach the qualified immunity question as noted earlier. However, out of an abundance of caution, this Court will address the applicability of the qualified immunity defense. The Court will first determine if Braud violated one of Adam's clearly established constitutional rights. For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. A right is clearly established only if it would be clear to a reasonable actor that his conduct was unlawful under the particular facts involved. The right allegedly violat-

**117.** *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975).

**118.** *Id.* at 319–20, 95 S.Ct. 992("The most capable candidates for school board positions might be deterred from seeking office if heavy burdens upon their private resources were a likely prospect during their tenure.").

**119.** *Chiu v. Plano Independent School Dist.*, 260 F.3d 330, 342 (5th Cir.2001).

**120.** *Anderson v. Pasadena Independent School Dist.*, 184 F.3d 439, 443 (5th Cir.1999); *Meyer v. Austin Independent School Dist.*, 161 F.3d 271, 273–74 (5th Cir.1998); and *Systems Contractors Corp. v. Orleans Parish School Bd.*, 148 F.3d 571, 574 (5th Cir.1998).

**121.** *Hassan, supra* at 1079.

ed must be defined at the appropriate level of specificity before a court can determine if it was clearly established.[122] The Court finds that Braud did not violate one of Adam's clearly established rights under the facts of this case. The Court's conclusion that none of Adam's constitutional rights were violated supports this finding. Further, the sparse jurisprudence on how school officials should react in similar situations also supports the conclusion that no clearly established right has been violated. "If the law did not put the [actor] on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate."[123] Thus, the Court finds that none of Adam's clearly established rights were violated by Braud in his individual capacity.

Even if this Court were to find that one or more of the rights asserted by plaintiff was were violated was clearly established, Braud is still entitled to qualified immunity under the second inquiry the Court must make. Under the second inquiry, the Court must determine if the defendant's acts were objectively reasonable in light of the law clearly established at the time the defendant acted. If the law is clearly established, an actor is still entitled to qualified immunity if at the time of the action, the actor believed his actions were objectively legally reasonable.[124] "Qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.' But if 'it would be clear to a reasonable [actor] that his conduct was unlawful in the situation he confronted,' then qualified immunity does not apply. If on the other hand, 'officers of reasonable competence could disagree on the issue, immunity should be recognized.' "[125] Braud's actions were objectively reasonable at the time he acted. In fact, Braud was doing exactly what he or any other reasonable principal should have done under the facts presented. Braud was charged with the responsibility of protecting all EAHS students, and insuring that Adam did not pose a danger to the other students, faculty and property of EAHS. The action he took was in the performance of this important responsibility and duty. There was no evidence presented which would support the conclusion that Braud was ever acting in bad faith or without regard to Adam's constitutional rights. Thus, the Court finds that Braud is entitled to qualified immunity even if Adam's rights were found to be clearly established.[126]

2. *Whether Robert Cloutare and Conrad Braud are subject to section 1983 liability in their official capacities*

The distinction between a state official being sued in a personal and official capacity was clarified by the United States Supreme Court in *Hafer v. Melo*.[127] A suit against a state official in his official capacity is treated as a suit against the state. Because the real party in interest in an official-capacity suit is the governmental entity and not the named individual, the "entity's 'policy or custom' must have played a part in the violation of federal law."[128] Neither a state nor its officials

---

122. *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001).

123. *Id.* at 202, 121 S.Ct. at 2156–57.

124. *Nunez v. Simms*, 341 F.3d 385, 387 (5th Cir.2003).

125. *Hope v. Pelzer*, 536 U.S. 730, 752, 122 S.Ct. 2508, 2522, 153 L.Ed.2d 666 (2002).

126. For Braud not to have acted and then a student or teacher would have been injured or killed or school property damaged or destroyed may have subjected the principal to damage suits or criticism.

127. 502 U.S. 21, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991).

128. *Id.* at 25, 112 S.Ct. at 361–62 *citing Kentucky v. Graham*, 473 U.S. 159, 166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985).

acting in their official capacities are "persons" for section 1983 purposes.[129] For this reason, official-capacity suits are governed by the rules pertaining to municipal and state governmental liability.[130] In contrast, personal-capacity suits seek to impose individual liability upon a government officer for actions taken under the color of state law. A showing that the official, acting under color of state law, caused the deprivation of a federal right is enough to establish personal liability in a section 1983 action.[131]

Because official-capacity suits are governed by the rules pertaining to municipal and state governmental liability, qualified immunity does not pertain to official-capacity claims for injunctive or declaratory relief as these claims are considered to be official-capacity claims against the relevant government entity.[132] Thus, qualified immunity would not necessarily be the ground for dismissing plaintiffs' case against Cloutare and Braud in their official capacities. However, because Cloutare and Braud are being treated as arms of the school board for purposes of the official-capacity suit, plaintiffs are required to prove that the Ascension Parish School Board or EAHS has a policy or custom that caused the deprivation of Adam's constitutional rights.[133] Plaintiffs have failed to submit any evidence to establish whether a policy or custom in the Ascension Parish School Board or EAHS led to a constitutional deprivation. Plaintiffs also failed to present facts to even create a material issue of fact in dispute

which would cause the court to deny defendants' motion for summary judgment. Accordingly, the Court finds as a matter of law that no policy or custom exists at the Ascension Parish School Board or EAHS which deprived Adam of his constitutional rights under the facts of this case. This conclusion is further supported by the Court's determination that none of Adam's constitutional rights were violated. In the alternative, the Court finds that even if constitutional violations had occurred, plaintiffs' official-capacity claims must still fail because plaintiffs have not introduced any evidence in the record to establish that a policy or custom of the Ascension Parish School Board or EAHS systematically deprives students of their constitutional rights. The only evidence presented by plaintiffs pertained to their individual claims. Based on the law and evidence in the record, summary judgment on the official capacity claims is granted.

## D. Attorneys Fees under 42 U.S.C. § 1988

The Court has reviewed the record and determined that defendants are not entitled to attorneys fees under 42 U.S.C. § 1988 and the facts of this case. The fact that defendants have successfully defended their suit does not mean that they are entitled to attorney's fees under Section 1988. The issues involved in this case cannot be said to be frivolous even though the Court found plaintiff's claims to be without merit under the law and facts of this case.

129. *Id.* at 26, 112 S.Ct. at 362.

130. *Turner v. Houma Mun. Fire and Police Civil Serv. Bd.,* 229 F.3d 478, 483 (5th Cir. 2000).

131. *Hafer, supra* at 26, 112 S.Ct. at 362.

132. *See Valley v. Rapides Parish School Bd.,* 118 F.3d 1047, 1051, n. 1 (5th Cir.1997)("It is

well established law in this Circuit that the defenses of qualified and absolute immunity do not extend to suits for injunctive relief under [section 1983]."). *See also Chrissy F. v. Mississippi Dept. of Pub. Welfare,* 925 F.2d 844, 849 (5th Cir.1991).

133. *See Monell v. Dept. of Social Services of City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

### III. Conclusion

First Amendment protection cannot be provided to a high school student's graphic drawing of his high school being soaked with gasoline, surrounded by an individual with a torch and a missile, and illustrating administrators being assaulted and its students subjected to racial expletives and slogans. This conclusion is supported under a pure-*Tinker* analysis, the true-threat inquiry, and the Fifth Circuit's approach in *Canady*. Thus, plaintiffs' First Amendment claims must be dismissed as a matter of law under the facts of this case.

This Court also finds that where a school administrator discovers a drawing like the one involved in this case, the reasonableness requirement for a search or seizure is satisfied and plaintiffs' Fourth Amendment rights were not violated under the facts of this case. Therefore, plaintiffs' Fourth Amendment claims are dismissed as a matter of law.

There was no procedural due process violation under the facts of this case. Even though no formal hearing was held, Adam admitted the violation of the rule for which he was removed from EAHS and sent to an alternative school. There is also no procedural violation of the student's right where his mother waives such a hearing after it is offered. Thus, plaintiffs' procedural due process claims are dismissed as a matter of law under the facts of this case.

Even if these constitutional claims were found viable, plaintiffs' Section 1983 claims against Superintendent Robert Cloutare and Principal Conrad Braud, both in their individual and official capacities, are barred by the doctrine of qualified immunity. The claims against Braud individually are barred because plaintiffs have failed to show any clearly established right was violated, and alternatively, Braud's actions were objectively reasonable. The claims against Cloutare and Braud in their official capacities are barred because plaintiffs failed to show that the Ascension Parish School Board or EAHS has a policy or custom of systematically depriving students of their constitutional rights.

Finally, defendants' claims for attorney's fees are denied.

Therefore,

IT IS ORDERED that defendants' motion for summary judgment is granted.

IT IS FURTHER ORDERED that plaintiffs' suit be dismissed with prejudice.

IT IS FURTHER ORDERED that defendants' demand for attorneys fees under 42 U.S.C. § 1988 is denied.

Judgment shall be entered accordingly.