United States Court of Appeals
Fifth Circuit

**F I L E D**

**December 10, 2004**

Charles R. Fulbruge III
Clerk

In the United States Court of Appeals

For the Fifth Circuit

_____

No. 04-30162

_____


ADAM PORTER, ET AL,

                              Plaintiffs,

ADAM PORTER,

                              Plaintiff - Appellant,

                              versus

ASCENSION PARISH SCHOOL BOARD, et al.,

                              Defendants - Appellees.

_____

Appeal from the United States District Court
For the Middle District of Louisiana

_____


Before KING, Chief Judge, HIGGINBOTHAM, and DAVIS, Circuit
Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

    This case highlights the difficulties of school administrators
charged to balance their duty to provide a safe school with the
constitutional rights of individual students when violence in
schools is a serious concern.  We must decide whether officials
within the Ascension Parish School District responded appropriately
in removing Adam Porter from East Ascension High School and
requiring him to enroll in an alternative school for a sketch
depicting a violent siege on the EAHS that he had drawn two years

earlier, and was accidentally taken to school by his younger brother. We hold that the only defendant left in the case, EAHS principal Conrad Braud, is entitled to qualified immunity with respect to Adam's First Amendment claim, and affirm the district court's grant of summary judgment.

I

A

When Adam Porter was fourteen years old, he sketched a drawing of his school, East Ascension High School, in the privacy of his home. It was crudely drawn, depicting the school under a state of siege by a gasoline tanker truck, missile launcher, helicopter, and various armed persons. The sketch also contained obscenities and racial epithets directed at characters in the drawing, a disparaging remark about EAHS principal Conrad Braud, and a brick being hurled at him. After completing the sketch, Adam showed it to his mother, Mary LeBlanc, his younger brother, Andrew Breen, and a friend, Kendall Goudeau, who was living with the family at the time. The sketchpad was then stored in a closet in Adam's home.

Two years later, Andrew Breen, then age twelve, rummaged through the closet looking for something to draw on, and came upon Porter's sketchpad. Andrew drew a llama on a blank page in the pad, and then took the pad to his school, Galvez Middle School, to show his drawing to his teacher. On March 15, 2001, while riding the bus on his way home from school, Andrew allowed a fellow student to see his drawing. While flipping through the pages of

2

the pad, the student came upon the two-year old drawing by Adam and showed it to the bus driver, Diane McCauley, exclaiming, "Miss Diane, look, they're going to blow up EAHS." McCauley immediately confiscated the pad. On the following morning, McCauley took the pad to Linda Wilson, the principal of Galvez Middle School, and Myles Borque, the in-school suspension coordinator. After viewing Adam's drawing, Wilson called Andrew to her office where he was questioned about the drawing and his book bag was searched. In response to questioning by Wilson and Borque, Andrew admitted that Adam had drawn the picture. Andrew was then suspended for possessing the drawing on school grounds.

The sketchpad was sent to EAHS where school resource officer Robert Rhodes interrupted a meeting to show the drawing to principal Conrad Braud and assistant principal Gwynne Pecue. Alarmed, Braud and Pecue immediately summoned Adam to Rhodes's office where he readily admitted that he had drawn the sketch two years earlier. School officials then searched Adam's book bag and his person and found a box cutter with a one-half inch exposed blade in his wallet. The officials also found notebooks in Adam's bag containing references to death, drugs, sex, depictions of gang symbols, and a fake ID. Adam explained that he used the box cutter in his after-school job at a local grocery store. Although unclear as to when, the record indicates that he later explained that the references to death were part of a homework assignment, and that the "gang symbols" referred only to a group of young men

3

with whom Adam associated, and who Braud did not consider to be a threat.

Adam's mother, Mary LeBlanc, was contacted, and after arriving at EAHS, was told that Adam was being recommended for expulsion. Adam and his mother were then allowed to leave carrying a written recommendation for expulsion and instructions for Adam to remain at home until a hearing could be held. No hearing date was immediately set. Shortly thereafter, Officer Rhodes obtained a warrant to arrest Adam for "terrorizing" EAHS, and Adam was held for four nights at the Donaldsonville jail on charges of terrorizing the school and carrying an illegal weapon.

A week later, on March 23, 2001, Mary LeBlanc met with Linda Lamendola, hearing officer for the Ascension Parish School Board. LeBlanc was advised that expulsion hearings were regularly decided in the school's favor, and that Adam could immediately enroll in the Ascension Parish Alternative School and continue his education if she waived the hearing. LeBlanc signed the waiver form provided by Lamendola, and Adam was enrolled in the alternative school. The following August, Adam was allowed to re-enroll at EAHS, but dropped out in March, 2002.

B

Mary LeBlanc filed suit on behalf of Adam and Andrew against the Ascension Parish School Board, Robert Cloutare in his official capacity as superintendent of the School Board, Conrad Braud, individually and in his official capacity as Principal of EAHS, and

4

Linda Wilson, individually and in her official capacity as principal of Galvez Middle School. The suit, brought under 42 U.S.C. § 1983, alleged violations of the First, Fourth, and Eighth Amendments, and a denial of equal protection and procedural due process and rights secured by 20 U.S.C. § 1415.[1] Defendants filed a motion for summary judgment asserting that no constitutional violation could be shown as a matter of law and claiming the defense of qualified immunity.

The district court dismissed without objection plaintiffs' equal protection, Eighth Amendment, and § 1415 claims, and plaintiffs agreed to dismiss all claims against Linda Wilson. The district court analyzed Adam's First Amendment claim, and concluded that his drawing was not entitled to protection under any of three different standards.[2] The court then disposed of Adam's Fourth Amendment claim, finding that the school's search and detention of him was reasonable.[3] The court next found that Adam's procedural due process claim was unavailing based on Adam's admission that he

---

[1] 20 U.S.C.A. § 1415 (2000) (providing parents of disabled children with certain procedural safeguards regarding the evaluation, placement and education of their children within the public school system).

[2] *Porter v. Ascension Parish Sch. Bd.*, 301 F. Supp. 2d 576, 582-89 (M.D. La. 2004). In particular, the district court analyzed whether Adam's drawing was protected under (1) the "material and substantial interference" standard set forth in *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969), and *LaVine v. Blaine Sch. Dist.*, 257 F.3d 981 (9th Cir. 2001); (2) the "true threat" standard set forth in *Watts v. United States*, 394 U.S. 705 (1969), and *Doe v. Pulaski County Special Sch. Dist.*, 306 F.3d 616 (8th Cir. 2002); and (3) our non-viewpoint based approach set forth in *Canady v. Bossier Parish Sch. Bd.*, 240 F.3d 437 (5th Cir. 1996).

[3] *Porter*, 301 F. Supp. 2d at 589-92.

5

had drawn the sketch and that the items found in his book bag and on his person belonged to him, and LeBlanc's signed waiver of his right to a hearing.[4] Next, the court found that even if Adam had established a violation of his rights, Braud was entitled to qualified immunity.[5] Finally, the court held that Adam had produced no evidence of a policy or custom on the part of the Ascension Parish School Board leading to a violation of his rights, precluding his official capacity claims against Braud and Cloutare.[6]

Based on these findings, the district court entered summary judgment for the defendants. Adam filed a timely notice of appeal from this judgment.

## II

"We review the grant of a motion for summary judgment *de novo*."[7] Summary judgment is appropriate when "the pleadings and the evidence demonstrate that no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law."[8] In the present case, the district court granted the defendants' motion for summary judgment on grounds that plaintiffs had failed

---

[4]*Id.* at 592-95.

[5]*Id.* at 595-97.

[6]*Id.* at 597-98.

[7]*Pluet v. Frasier*, 355 F.3d 381, 383 (5th Cir. 2004).

[8]*Id.* (citing FED. R. CIV. P. 56(c)).

to raise a material fact issue with respect to any of their constitutional claims, and on the alternative ground that defendant Braud was entitled to summary judgment based on qualified immunity.[9]

Although denominated in the alternative, these holdings follow our analysis for determining whether a state official is entitled to qualified immunity. When reviewing a grant of summary judgment based on qualified immunity, we must first determine whether a plaintiff successfully alleged facts showing the violation of a constitutional right by state officials, and whether there is a genuine issue of material fact that the violation occurred.[10] "If there is no constitutional violation, our inquiry ends."[11]

If we determine that the plaintiff's alleged facts make out a constitutional violation, we then ask whether the right allegedly

---

[9]Adam did not brief on appeal the argument that the district court erred in granting summary judgment for Braud and Cloutare on claims raised against them in their official capacity. Therefore, we will not address this argument. *See Proctor & Gamble Co. v. Amway Corp.*, 376 F.3d 496, 499 n.1 (5th Cir. 2004) ("Failure adequately to brief an issue on appeal constitutes waiver of that argument.").

[10]*See Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry."); *Finch v. Fort Bend Indep. Sch. Dist.*, 333 F.3d 555, 561 (5th Cir. 2003) (when considering whether to grant a summary judgment motion based on qualified immunity, district court must determine whether a material fact question exists regarding whether the defendant engaged in conduct violating the plaintiff's clearly established rights); *Barrow v. Greenville Indep. Sch. Dist.*, 332 F.3d 844, 846 (5th Cir. 2003) (finding that first question in qualified immunity analysis is whether, "viewing the facts in a light most favorable to the plaintiff . . . the plaintiff has alleged the violation of a constitutional right").

[11]*Mace v. City of Palestine*, 333 F.3d 621, 623 (5th Cir. 2003).

7

violated was "clearly established" such that "it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted."[12]  We have found that a "right can be said to have been clearly established only if all reasonable officials in the defendant's position would have concluded that the challenged state action was unconstitutional."[13]

Even if we find that the right was clearly established at the time of the alleged violation, however, a defendant will still be entitled to qualified immunity if the defendant's conduct was "objectively reasonable in light of 'clearly established' law at the time of the violation."[14]  The reasonableness of an official's actions must be assessed in light of "the facts available to him at the time of his action and the law that was clearly established at the time of the alleged illegal acts."[15]

A

1

Adam first claims that EAHS violated the First Amendment in removing him from school based on the contents of his drawing.

---

[12]*Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *Barrow*, 332 F.3d at 846 (second question in qualified immunity analysis is whether the "constitutional right was clearly established when the violation supposedly occured").

[13]*Barrow*, 332 F.3d at 846 (citing *Cozzo v. Tangipahoa Parish Council*, 279 F.3d 273, 284 (5th Cir. 2002)).

[14]*Chiu v. Plano Indep. Sch. Dist.*, 339 F.3d 273, 279 (5th Cir. 2003) (quoting *Siegert v. Gilley*, 500 U.S. 226, 231-32 (1991)).

[15]*Id.* at 284 (quoting *Hays County Guardian v. Supple*, 969 F.2d 111, 125 (5th Cir. 1992)).

Uncertain as to the appropriate legal standard under which the drawing was to be analyzed, the district court employed three different approaches before concluding that the drawing was not entitled to First Amendment protection. The parties argue all three standards on appeal.

The first two standards employed by the district court were developed specifically to balance the First Amendment rights of students with the special need of educators to maintain a safe and effective learning environment.[16] The first standard, originally set forth in *Tinker v. Des Moines Independent Community School District*, provides that school officials may regulate student speech when they can demonstrate that such speech would "substantially interfere with the work of the school or impinge

---

[16]*See Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) ("A school need not tolerate student speech that is inconsistent with its 'basic educational mission,' even though the government could not censor similar speech outside the school.") (quoting *Bethel Sch. Dist. v. Fraser*, 478 U.S. 675, 685 (1986)); *Canady*, 240 F.3d at 441 ("While certain forms of expressive conduct and speech are sheltered under the First Amendment, constitutional protection is not absolute, especially in the public school setting. Educators have an essential role in regulating school affairs and establishing appropriate standards of conduct.").

Our court has identified four categories of school regulations aimed at student speech, with each being reviewing under a different standard. These categories are: (1) school regulations directed at specific student viewpoints; (2) school regulations governing student expression involving lewd, vulgar, obscene or offensive speech; (3) school regulations governing student speech related to school-sponsored activities; and (4) school regulations that are viewpoint-neutral and fall into none of the previous three categories. *Id.*, 240 F.3d at 441-44. Because EAHS officials did not punish Adam for the lewd, vulgar, obscene or offensive content of his drawing, and because his drawing was not composed as part of a school sponsored activity, the district court correctly declined to examine the drawing under categories (2) and (3).

9

upon the rights of other students."[17]  We have found that this standard applies to school regulations directed at specific student viewpoints.[18]  The second standard provides that school officials may regulate student speech if the regulation "furthers an important or substantial government interest; if the interest is unrelated to the suppression of student expression; and if the incidental restrictions on First Amendment activities are no more than is necessary to facilitate that interest."[19]  We have found that this standard applies to regulations unrelated to any viewpoint.[20]  Both of these standards are applicable to student expression "that happens to occur on the school premises."[21]

Given the unique facts of the present case, we decline to find that Adam's drawing constitutes student speech on the school premises.  Adam's drawing was completed in his home, stored for two years, and never intended by him to be brought to campus.  He took no action that would increase the chances that his drawing would find its way to school; he simply stored it in a closet where it remained until, by chance, it was unwittingly taken to Galvez Middle School by his brother.  This is not exactly speech on campus

---

[17]*Canady*, 240 F.3d at 442 (quoting *Tinker*, 393 U.S. at 508) (internal quotation marks omitted).

[18]*Id.*

[19]*Id.* at 443.

[20]*Id.*

[21]*Id.* (quoting *Kuhlmeier*, 484 U.S. at 271).

10

or even speech directed at the campus.[22]

The third standard employed by the district court in analyzing Adam's drawing was developed to deal with speech constituting a "true threat." As a general rule, the First Amendment prohibits government actors from "dictating what we see or read or speak or hear."[23] However, the government can proscribe a true threat of

---

[22]We are aware of the difficulties posed by state regulation of student speech that takes place off-campus and is later brought on-campus either by the communicating student or others to whom the message was communicated. Refusing to differentiate between student speech taking place on-campus and speech taking place off-campus, a number of courts have applied the test in *Tinker* when analyzing off-campus speech brought onto the school campus. *See Boucher v. Sch. Bd. of Sch. Dist. of Greenfield*, 134 F.3d 821, 827-28 (7th Cir. 1998) (student disciplined for an article printed in an underground newspaper that was distributed on school campus); *Sullivan v. Houston Indep. Sch. Dist.*, 475 F.2d 1071, 1075-77 (5th Cir. 1973) (student punished for authoring article printed in underground newspaper distributed off-campus, but near school grounds); *LaVine*, 257 F.3d at 989 (analyzing student poem composed off-campus and brought onto campus by the composing student under *Tinker*); *Killion v. Franklin Reg'l Sch. Dist.*, 136 F. Supp. 2d 446, 455 (W.D. Pa. 2001) (student disciplined for composing degrading top-ten list distributed via e-mail to school friends, who then brought it onto campus; author had been disciplined before for bringing top-ten lists onto campus); *Emmett v. Kent Sch. Dist. No. 415*, 92 F. Supp. 2d 1088, 1090 (W.D. Wash. 2000) (applying *Tinker* to mock obituary website constructed off-campus); *Beussink v. Woodland R-IV Sch. Dist.*, 30 F. Supp. 2d 1175, 1180 (E.D. Mo. 1998) (student disciplined for article posted on personal internet site); *Bystrom v. Fridley High Sch.*, 686 F. Supp. 1387, 1392 (D. Minn. 1987) (student disciplined for writing article that appeared in an underground newspaper distributed on school campus).

Our analysis today is not in conflict with this body of case law; rather, the fact that Adam's drawing was composed off-campus and remained off-campus for two years until it was unintentionally taken to school by his younger brother takes the present case outside the scope of these precedents. *See Thomas v. Bd. of Educ., Granville Cent. Sch. Dist.*, 607 F.2d 1043, 1050-52 (2d. Cir. 1979) (refusing to apply *Tinker* to student newspaper published and distributed off-campus); *Klein v. Smith*, 635 F. Supp. 1440, 1441-42 (D. Me. 1986) (enjoining suspension of student who made a vulgar gesture to a teacher while off-campus); *see also Killion*, 136 F. Supp. 2d at 454 ("Although there is limited case law on the issue, courts considering speech that occurs off school grounds have concluded (relying on Supreme Court decisions) that school official's authority over off-campus expression is much more limited than expression on school grounds."); Clay Calvert, *Off-Campus Speech, On-Campus Punishment: Censorship of the Emerging Internet Underground*, 7 B.U.J. Sᴄɪ. & Tᴇᴄʜ. L. 243, 279 (2001) (noting that *Tinker* is ill-suited to deal with off-campus student expression that is unintentionally brought on-campus by others).

[23]*Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 245 (2002).

violence without offending the First Amendment.[24] Speech is a "true threat" and therefore unprotected if an objectively reasonable person would interpret the speech as a "serious expression of an intent to cause a present or future harm."[25] The protected status of the threatening speech is not determined by whether the speaker had the subjective intent to carry out the threat; rather, to lose the protection of the First Amendment and be lawfully punished, the threat must be intentionally or knowingly *communicated* to either the object of the threat or a third person.[26] Importantly, whether a speaker intended to communicate a potential threat is a threshold issue, and a finding of no intent to communicate obviates the need

---

[24]*See Virginia v. Black*, 538 U.S. 343, 359 (2003) (upholding Virginia law prohibiting cross burning with intent to intimidate); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992) ("[T]hreats of violence are outside the First Amendment."); *Watts v. United States*, 394 U.S. 705, 707-08 (1969) (finding that the First Amendment permits states to prohibit speech that constitutes a "true threat").

[25]*Doe*, 306 F.3d at 622; *see also United States v. Fulmer*, 108 F.3d 1486, 1490-91 (1st Cir. 1997) (collecting and discussing cases).

[26]*See Black*, 538 U.S. at 359 ("'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals."); *Doe*, 306 F.3d at 624 ("In determining whether a statement amounts to an unprotected threat, there is no requirement that the speaker intended to carry out the threat, nor is there any requirement that the speaker was capable of carrying out the purported threat of violence. However, the speaker must have intentionally or knowingly communicated the statement in question to someone before he or she may be punished or disciplined for it." (citing *Planned Parenthood of the Columbia/Willamette, Inc. v. Am. Coalition of Life Activists*, 290 F.3d 1058, 1075 (9th Cir. 2002)); *see also United States v. Stevenson*, 126 F.3d 662, 664 (5th Cir. 1997) (finding that, for purpose of criminalizing speech as a threat under 18 U.S.C. § 115(a)(1)(B) and 18 U.S.C. § 871, the speaker need only "intentionally or knowingly [communicate] his threat") (quoting *United States v. Orozco-Santillan*, 903 F.2d 1262, 1265 (9th Cir. 1990)).

to assess whether the speech constitutes a "true threat."[27]

The Eighth Circuit's decision in *Doe v. Pulaski County Special School District*[28] is an illustrative application of these principles to an alleged threat made by a student off-campus but carried on-campus by another student.  In *Doe*, a boy in junior high school drafted two letters to his former girlfriend containing "violent, misogynic and obscenity-laden rants" expressing a desire to assault and murder her.[29]  Months later, the boy's best friend discovered the letters, and after first objecting, the boy allowed his friend to read them.  The friend later absconded with at least one of the letters and showed it to the girlfriend.  In addition, the boy had discussed the violent letters with his former girlfriend in phone conversations, ultimately admitting that he penned the letters.[30]

After obtaining and reading one of the letters, the girlfriend reported the boy to school officials who recommended him for expulsion.  The boy's parents filed suit, arguing infringement of his First Amendment rights.  The district court held that the letter was protected under the First Amendment, and did not constitute a true threat because the boy did not intend to deliver

---

[27]*See Doe*, 306 F.3d at 624 ("Before we address whether a reasonable recipient would view the letter as a threat, we are faced with a threshold question of whether J.M. intended to communicate the purported threat."); *Orozco-Santillan*, 903 F.2d at 1266 n.3 ("The only intent requirement [in the true threat analysis] is that the defendant intentionally or knowingly communicates his threat, not that he intended or was able to carry out his threat.").

[28]306 F.3d 616 (8th Cir. 2002).

[29]*Id.* at 619.

[30]*Id.* at 619-20.

it to his girlfriend.  Reversing the district court, the Eighth Circuit found that a reasonable and objective recipient would regard the letter as a true threat.  In addition, the Eighth Circuit found that the boy intentionally communicated the threat because he allowed his friend to read the letter knowing that his friend was also a close friend of his former girlfriend. Furthermore, the boy discussed the letters with his girlfriend on the telephone on multiple occasions.[31]

Unlike the court in *Doe*, we need not decide whether Adam's drawing would constitute a true threat in the eyes of a reasonable and objective person because Adam did not intentionally or knowingly communicate his drawing in a way sufficient to remove it from the protection of the First Amendment.  While it is true that Adam showed his drawing to his mother, brother, and friend Kendall Goudeau, this communication was confined to his own home, and more than two years passed before the drawing serendipitously reached the EAHS campus.  That the introduction of the drawing to EAHS was wholly accidental and unconnected with Adam's earlier display of the drawing to members of his household is undisputed.  Private writings made and kept in one's home enjoy the protection of the First Amendment, as well as the Fourth.[32]  For such writings to lose

_____

[31]*Id.* at 624-25.

[32]*See Stanley v. Georgia*, 394 U.S. 557, 568 (1969) (holding that the First and Fourteenth Amendments prohibit the state's regulatory power from extending to possession by an individual of obscene materials in his home); *Doe*, 306 F.3d at 624 ("The government . . . has no valid interest in the contents of a writing that a person . . . might prepare in the confines of his own bedroom."); *United*

their First Amendment protection, something more than their accidental and unintentional exposure to public scrutiny must take place.[33]

Because Adam's drawing cannot be considered a true threat as it was not intentionally communicated, the state was without authority to sanction him for the message it contained. Although Adam has produced evidence that his drawing comprised the primary impetus for his expulsion from school, he has not established this as a matter of law. Consequently, a fact issue remains as to whether Adam's First Amendment rights were infringed by EAHS, and the district court erred in finding otherwise.

2

Because Adam raised a material fact question with respect to his First Amendment claim, we must proceed to ascertain whether Adam's rights were "clearly established" such that "it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted."[34] "This is not to say that an

---

*States v. Pryba*, 502 F.2d 391, 407 (D.C. Cir. 1974) ("The principle underlying *Stanley* . . . is that the Constitution extends special safeguards to the privacy of the home, in common with a few other special societal institutions.").

[33]The district court expressly rejected the view that threats must first be intentionally communicated before losing First Amendment protection, noting: "Plaintiffs seek to distinguish this case from *Doe* by arguing that Adam did not intentionally disclose his drawing to anyone else. *This does not and should not matter.* What does matter is that the drawing did end up in the hands of a student, a bus driver and school administrators . . . ." *Porter*, 301 F. Supp. 2d at 588 (emphasis added). This conclusion erroneously ignores the clear dictate that "true threats" must first be communicated in some knowing and intentional manner.

[34]*Anderson*, 483 U.S. at 640; *see Mace*, 333 F.3d at 623-24 (discussing two-step qualified immunity analysis).

15

official action is protected by qualified immunity unless the very act in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent."[35]  Even if we find that Adam's right to First Amendment protection is clearly established, Principal Braud will still receive qualified immunity if his actions were objectively reasonable in light of the circumstances he faced at the time he acted.[36]  Qualified immunity should be recognized if officials "of reasonable competence could disagree on [whether a particular action is lawful]."[37]  The Supreme Court has observed that the protection afforded by qualified immunity is broad, protecting "all but the plainly incompetent or those who knowingly violate the law."[38]

It is indisputable that expressions such as Adam's drawing, provided that they do not constitute a true threat, are entitled to First Amendment protection.  It is also clear that such drawings are entitled to diminished First Amendment protection when composed by a student on-campus, or purposefully brought onto a school campus where they become on-campus speech subject to special

---

[35]*Anderson*, 483 U.S. at 640 (1987).

[36]*Saucier v. Katz*, 533 U.S. 194, 202 (2001).

[37]*Hope v. Pelzer*, 536 U.S. 730, 752 (2002) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)) (internal quotation marks omitted).

[38]*Id.* (quoting *Malley*, 475 U.S. at 341) (internal quotation marks omitted).

16

limitations.[39]   The line dividing fully protected "off-campus" speech from less protected "on-campus" speech is unclear, however, in cases such as this involving off-campus speech brought on-campus without the knowledge or permission of the speaker.

Many courts have applied the *Tinker* standard in evaluating off-campus student speech later brought on-campus by persons other than the speaker.   These cases have dealt with such things as "underground" student newspapers distributed off-campus,[40] student-run websites created on off-campus computers,[41] and various writings brought on-campus by students other than their original author.[42] Although reaching differing conclusions as to the legality of restrictions placed upon the speech in question, these cases consistently approach off-campus speech brought on-campus as

[39]*See Kuhlmeier*, 484 U.S. at 266 ("[T]he First Amendment rights of students in the public schools are not automatically coextensive with the rights of adults in other settings and must be applied in light of the special characteristics of the school environment.").

[40]*See Boucher*, 134 F.3d at 827-28 (applying *Tinker* and finding that article advocating "hacking" school computers allowed school officials to reasonably forecast that substantial disruption of school functions would ensue); *Shanley v. N.E. Indep. Sch. Dist.*, 462 F.2d 960, 970-75 (5th Cir. 1972) (analyzing student newspaper published off-campus and occasionally taken on-campus by others under *Tinker* while noting that "it is not at all unusual to allow the geographical location of the actor to determine the constitutional protection that should be afforded to his or her acts"); *Sullivan*, 475 F.2d at 1076 (applying *Tinker* and finding that student newspaper published off-campus did not substantially disrupt school activities).

[41]*See Emmett*, 92 F. Supp. 2d at 1090 (applying *Tinker* to mock obituary website constructed off-campus); *Beussink*, 30 F. Supp. 2d at 1180-82 (applying *Tinker* to student homepage built at an off-campus computer and accessed by other students on-campus; granting request for injunction in favor of student against 10-day suspension).

[42]*See Killion*, 136 F. Supp. 2d at 455 (applying *Tinker* to "top-ten" list authored by a student off-campus, and taken on-campus by others without his express instruction).

subject to regulation under *Tinker*'s "material and substantial" disruption test.

Not all courts have adopted this approach, however, and some have found that off-campus speech is entitled to full First Amendment protection even when it makes its way onto school grounds without the assistance of the speaker.[43] Still others have adopted a combination approach, analyzing off-campus speech under a flurry of standards in an effort to comprehensively address all possible legal approaches.[44] Frustrated by these inconsistencies, commentators have begun calling for courts to more clearly delineate the boundary line between off-campus speech entitled to greater First Amendment protection, and on-campus speech subject to greater regulation.[45]

---

[43]*See Thomas*, 607 F.2d at 1050 ("[B]ecause school officials ventured out of the school yard and into the general community where the freedom accorded expression is at its zenith, their actions must be evaluated by the principles that bind government officials in the public arena."); *see also Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 688 (1986) (Brennan, J., concurring) (noting that student who was penalized for making lewd comments during a school-sponsored debate could not be punished had he "given the same speech outside of the school environment . . . simply because government officials considered his language to be inappropriate . . .").

[44]*See Mahaffey v. Aldrich*, 236 F. Supp. 2d 779, 783-86 (E.D. Mich. 2002) (analyzing an off-campus website under *Tinker* and the true threat analysis while citing to *Thomas* for the proposition that school officials have limited authority over off-campus student expression). This appears to be the approach adopted by the district court below.

[45]*See, e.g.*, Robert Richards & Clay Calvert, *Columbine Fallout: The Long-Term Effects on Free Expression Take Hold in Public Schools*, 83 B.U.L. Rᴇᴠ. 1089, 1116-20 (2003) (questioning whether school officials should ever have jurisdiction over student speech that takes place off-campus, and is later transported on-campus by another without the communicating student's permission); Calvert, *supra* note 22, at 270-75 (2001) (noting that *Tinker* and its progeny do not apply to off-campus student speech that is not "brought" by the student onto the school campus); *see also* Sarah Redfield, *Threats Made, Threats Posed: School and Judicial Analysis in Need of Redirection*, 2003 B.Y.U. Eᴅᴜᴄ. & L.J. 663, 672-73

Because Adam's drawing was composed off-campus, displayed only to members of his own household, stored off-campus, and not purposefully taken by him to EAHS or publicized in a way certain to result in its appearance at EAHS, we have found that the drawing is protected by the First Amendment. Furthermore, we have found that it is neither speech directed at the campus nor a purposefully communicated true threat. However, a reasonable school official facing this question for the first time would find no "pre-existing" body of law from which he could draw clear guidance and certain conclusions. Rather, a reasonable school official would encounter a body of case law sending inconsistent signals as to how far school authority to regulate student speech reaches beyond the confines of the campus.

Given the unsettled nature of First Amendment law as applied to off-campus student speech inadvertently brought on campus by others, the contours of Adam's right to First Amendment protection in the present case cannot be deemed "clearly established" such that it would be clear to a reasonable EAHS official that sanctioning Adam based on the content of his drawing was unlawful

---

(2003)(noting that *Tinker*, *Fraser*, and *Kuhlmeier*, while possessing fact patterns far removed from today's school environments, continue to be applied to "new facts in new places"); William Bird, Comment, *True Threat Doctrine and Public School Speech–An Expansive View of a School's Authority to Discipline Allegedly Threatening Student Speech Arising Off Campus:* Doe v. Pulaski County Special School District, 26 U. ARK. LITTLE ROCK L.REV. 111, 128 (2003) ("[Courts have] failed to establish clear guidance as to how far the First Amendment extends in protecting off campus student speech . . . . Many courts have extended *Tinker* to apply to off-campus speech, while others have refused to recognize the school's disciplinary authority simply because of the speech's off campus origin.").

under the circumstances.  Thus, Braud is entitled to qualified immunity.

Even if Adam's rights were clearly established at the time of his expulsion, Braud's determination that the drawing was not entitled to First Amendment protection was objectively reasonable. The Supreme Court has observed that, even when a particular legal doctrine is clearly established, "[i]t is sometimes difficult for an [official] to determine how the relevant legal doctrine . . . will apply to the factual situation the [official] confronts."[46]

The record indicates that, at the time he recommended Adam for expulsion, Braud was aware that Adam was responsible for the drawing, that the drawing was two or three years old, and that the drawing had been brought to Galvez Middle School by Adam's younger brother.  These facts raise the subtle but important legal questions of whether the drawing constitutes on-campus speech, or an intentionally communicated threat.  Although we have answered both of these queries in the negative, we cannot say that all reasonable school officials facing these circumstances would reach the same conclusion.  For example, looking to case law holding that *Tinker* applies to a student's website created off-campus and later accessed on campus by others without the student's knowledge or encouragement, a reasonable school official might find that Adam's drawing is on-campus speech subject to regulation under the *Tinker*

---

[46]*Saucier*, 533 U.S. at 205.

test.[47]

The Supreme Court has noted the particular relevance of the qualified immunity doctrine to cases such as this, in which school officials are required to make decisions without the benefit of legal or factual clarity:

> As with executive officers faced with instances of civil disorder, school officials, confronted with student behavior causing or threatening disruption, also have an "obvious need for prompt action, and decisions must be made on factual information supplied by others." Liability for damages for every action which is found subsequently to have been violative of a student's constitutional rights and to have caused compensable injury would unfairly impose upon the school decisionmaker the burden of mistakes made in good faith in the course of exercising his discretion with the scope of his official duties. . . . Denying any measure of immunity in these circumstances "would contribute not to principled and fearless decision-making but to intimidation."[48]

Without condoning violations of student's constitutional rights, qualified immunity recognizes that school officials, such as Principal Braud, must be allowed to make reasonable mistakes when forced to act in the face of uncertainty.

Given the benefit of hindsight, the effort to fault Principal Braud for failing to conduct a more thorough investigation into the facts has purchase. For instance, Braud could have spoken with Andrew Breen about how he acquired the drawing, or queried Kendall Goudeau and other members of Adam's friend group about whether Adam

---

[47] *See, e.g.*, *Mahaffey*, 236 F. Supp. 2d at 783-86; *Emmett*, 92 F. Supp. 2d at 1090.

[48] *Wood v. Strickland*, 420 U.S. 308, 319 (1975) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 246 (1974) and *Pierson v. Ray*, 386 U.S. 547, 554 (1967)).

had recently discussed the drawing or shown it to them.  In fairness, however, it was reasonable for Braud to forgo further investigation given LeBlanc's waiver of Adam's right to a hearing. By waiving the hearing, LeBlanc eliminated an important opportunity for Braud and the Ascension Parish School Board to develop the facts more fully.

Given the unique facts of the present case, we find that Braud acted without the benefit of established law that was clear in its application to these facts, and in an objectively reasonable manner.  Thus, he is entitled to qualified immunity with respect to Adam's First Amendment claim.

B

Adam's second claim was that EAHS officials violated the Fourth Amendment by searching his book bag and his person immediately after he admitted that the drawing was his.  Finding that the search was reasonable, the district court held that Adam had failed to raise a material fact issue regarding his Fourth Amendment claim.  We agree that the search was reasonable under the circumstances, and therefore did not violate Adam's Fourth Amendment rights.

Students have a constitutional right under the Fourth and Fourteenth Amendments to be free from unreasonable searches and seizures while on school premises.[49]  At the same time, the "accommodation of the privacy interests of schoolchildren with the

---

[49]*See New Jersey v. TLO*, 469 U.S. 325, 334-37 (1985).

substantial need of teachers and administrators for freedom to maintain order in the schools does not require strict adherence to the requirement that searches be based on probable cause"; rather, the legality of school searches depends upon the "reasonableness, under all the circumstances, of the search."[50]

The action must be "justified at its inception"[51] and must be "reasonably related in scope to the circumstances which justified the interference in the first place."[52]

> Under ordinary circumstances, a search of a student by a teacher or other school official will be justified "at its inception" when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school. Such a search will be permissible in its scope when the measures adopted are reasonable related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction.[53]

Under the circumstances present at the time the search of Adam and his book bag was conducted, EAHS officials had reasonable grounds for suspecting that the search would produce evidence of an

---

[50]*Id.* at 341; *see Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 656 (1995) ("Fourth Amendment rights, no less than First and Fourteenth Amendment rights, are different in public schools than elsewhere; the 'reasonableness' inquiry cannot disregard the schools' custodial and tutelary responsibility for children."); *Milligan v. City of Slidell*, 226 F.3d 652, 654-55 (5th Cir. 2000) ("The [Supreme] Court [has] indicated that although the Fourth Amendment applies in schools, the nature of those rights is what is appropriate for children in school.").

[51]*TLO*, 469 U.S. at 341 (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)) (internal quotation marks omitted).

[52]*Id.* (quoting *Terry*, 392 U.S. at 20) (internal quotation marks omitted).

[53]*Id.* at 341-42.

infraction of a school rule or policy.[54]  Specifically, the officials were in possession of a drawing depicting numerous violent acts being perpetrated against EAHS, its students, and staff.  In addition, Adam had admitted that the drawing was his prior to the initiation of the search.  Given that school officials have a significant interest in deterring misconduct on the part of students,[55] and the fact that Adam had admitted to drawing the sketch depicting large-scale acts of violence directed at EAHS, the decision to search Adam was appropriate under the circumstances.[56]

The search was also reasonable in scope and not overly intrusive under the circumstances.  Following Adam's admission of

---

[54]As to the reasonableness of school searches under facts similar to those in the present case, see *Cuesta v. Sch. Bd. of Miami-Dade County*, 285 F.3d 962, 965-69 (11th Cir. 2002) (finding that violent drawings accompanied by threatening words aimed at the school is sufficient to create reasonable suspicion that the a student may intend to harm the school); *Williams v. Cambridge Bd. of Educ.*, 186 F. Supp. 2d 808, 815-16 (S.D. Ohio 2002) (finding probable cause for detention of students who had discussed bringing guns and bombs to school in the wake of the Columbine massacre when several classmates reported these statements to school officials); *Stockton v. City of Freeport*, 147 F. Supp. 2d 642, 646 (S.D. Tex. 2001) (finding that discovery of threatening letter on school property justified detention of suspected students, and noting that "officials in the Columbine massacre were harshly criticized for *failing* to take action regarding prior signs of problems").

[55]*Milligan*, 226 F.3d at 655 (noting that protecting students and deterring violent acts are "compelling government interests"); *Hassan v. Lubbock Indep. Sch. Dist.*, 55 F.3d 1075, 1079 (5th Cir. 1995) ("The Supreme Court has recognized the unique backdrop that schools present for the operation of the fourth amendment, specifically noting that 'the preservation of order and a proper educational environment requires close supervision of schoolchildren, as well as the enforcement of rules against conduct that would be perfectly permissible if undertaken by an adult.'" (quoting *TLO*, 469 U.S. at 741)).

[56]Our holding that EAHS acted reasonably in searching Adam does not conflict with our conclusion that his drawing did not represent a "true threat" to the school.  The fact that Adam did not intentionally communicate his drawing precludes the application of the true threat analysis.  Under the facts of this case, however, the discovery of the drawing on school grounds, and Adam's subsequent admission of responsibility for its ominous content, provided EAHS officials with reasonable suspicion sufficient to conduct a search of Adam.

24

responsibility for the drawing, EAHS officials searched his book bag, including textbooks and notebooks found in the bag, and Adam's person, including his wallet. Without question, searching a student's person and his book bag is a process invasive of personal privacy, requiring justification.[57] Justification for the scope of the search was present in this case based on the facts supporting the initial decision to search.[58]

Because the search of Adam by EAHS officials was reasonable at its inception, and was conducted in a reasonable manner when balanced against the school's interest in ensuring the safety and welfare of students, Adam's Fourth Amendment claim fails.

---

[57]*See TLO*, 469 U.S. 337-38 ("A search of a child's person or of a closed purse or other bag carried on her person, no less than a similar search carried out on an adult, is undoubtedly a severe violation of subjective privacy interests.").

[58]In particular, the powerful interest of promoting school safety justified the scope of the search in this case. *See Vernonia Sch. Dist. 47J*, 515 U.S. at 661 (when assessing scope of school searches, relevant inquiry is whether the interest being protected is "*important enough* to justify that particular search at hand"); *Shade v. City of Farmington*, 309 F.3d 1054, 1059-62 (8th Cir. 2002) (detention and pat-down of student after school employee reported seeing student with a knife was reasonable, even in light of fact that the knife had already been turned over by another student); *Thompson v. Carthage Sch. Dist.*, 87 F.3d 979, 982-83 (6th Cir. 1996) (finding that minimally invasive search of student's shoes and pockets was reasonable, even absent individualized suspicion, when school officials have independent grounds for believing that weapons had been brought to school on a particular day); *Brousseau v. Town of Westerly*, 11 F. Supp. 2d 177, 182 (D.R.I. 1998) (finding that searches by school officials for weapons and drugs are typically considered more compelling because the safety and welfare of students is implicated).
Additionally, intrusions on the personal privacy interests of students have been upheld based on lower indices of individualized suspicion than is present in this case. *See Cuesta*, 285 F.3d at 968-70 (arrest and strip search of student upheld as school officials had reasonable suspicion to believe that she was carrying weapons after connecting her to the distribution of a pamphlet filled with violent and racist content); *Stockton*, 147 F. Supp. 2d at 646 (finding that discovery of threatening letter on school property justified detention of a group of suspected students); *Milligan*, 226 F.3d at 654-55 (detention and questioning of students reasonable when school officials had reasonable suspicion that a fight was about to occur, even absent individualized suspicion that any one of them had engaged in or was about to engage in criminal behavior).

Adam's third claim alleges that he was denied his procedural due process right to a hearing before being removed from EAHS. Students have a "legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause and which may not be taken away for misconduct without adherence to the minimum procedures required by . . . [the Due Process] Clause."[59] At a minimum, "students facing suspension and the consequent interference with a protected property interest must be given some kind of notice and afforded some kind of hearing."[60]

Adam had no formal hearing before the Ascension Parish School Board before being removed from EAHS and transferred to the alternative school. But, Adam had admitted to school officials his responsibility for the drawing as well as his ownership of the box cutter. Whether a student "admitted the charges" leveled against him is "relevant in determining substantial prejudice or harm."[61] This is so because one of the primary purposes of expulsion

---

[59]*Goss v. Lopez*, 419 U.S. 565, 574 (1975).

[60]*Id.* at 579; *Keough v. Tate County Bd. of Educ.*, 748 F.2d 1077, 1083 (5th Cir. 1984) (finding that for suspensions greater than ten days, students should be provided with a hearing, the names of witnesses who will be called, a summary of those witnesses' probable testimony, and an opportunity to present evidence in rebuttal); *Sweet v. Childs*, 507 F.2d 675, 681 (5th Cir. 1975) ("The basic requirement for notice and a hearing prior to the expulsion of a student from a state-supported school are outlined in *Dixon*: 'The notice should contain a statement of the specific charges and grounds which, if proven, would justify expulsion . . . . The nature of the hearing should vary depending upon the circumstances of the particular case.'") (quoting *Dixon v. Alabama State Bd. of Educ.*, 294 F.2d 150, 158 (5th Cir. 1961)).

[61]*Keough*, 748 F.2d at 1083.

hearings is that of confirming whether the student threatened with expulsion actually committed the conduct for which he is being punished. Once a student has admitted his guilt, the need for a hearing is substantially lessened.[62]

In addition to Adam's admission, his mother signed a written waiver of his right to a hearing. A parent may waive her child's due process rights to notice and a hearing prior to expulsion, provided that the waiver is made voluntarily, knowingly and intelligently.[63] In the context of school disciplinary hearings, a waiver has been considered effective when it was placed in writing after a student's parents consulted with an attorney, was signed after all potential repercussions and consequences had been rationally evaluated, and stated in several places that the student was entitled to a hearing.[64]

Mary LeBlanc signed a form waiving Adam's right to a hearing

---

[62]*See Watson v. Beckel*, 242 F.3d 1237 (10th Cir. 2001) (adopting the reasoning of *Keough* in holding that a student who was expelled without being afforded sufficient process was not prejudiced because he admitted his guilt); *Black Coalition v. Portland Sch. Dist. No. 1*, 484 F.2d 1040, 1045 (9th Cir. 1973) (student not entitled to relief on due process claim because he "admitted all the essential facts which it is the purpose of a due process hearing to establish"); *Betts v. Bd. of Educ. of the City of Chicago*, 466 F.2d 629, 633 (7th Cir. 1972) ("As to what process is due, it is important that the plaintiff unequivocally admitted the misconduct with which she was charged. In such a circumstance, the function of procedural protections in insuring a fair and reliable determination of the retrospective factual question whether she in fact activated the false fire alarms is not essential.").

[63]*Davis Oil Co. v. Mills*, 873 F.2d 774, 787 (5th Cir. 1989) ("Although due process rights may be waived, a waiver of constitutional rights is not effective unless the right is intentionally and knowingly relinquished."); *Gonzalez v. Hidalgo County*, 489 F.2d 1043, 1046 (5th Cir. 1973) (same).

[64]*See Coplin v. Conejo Valley Unified Sch. Dist.*, 903 F. Supp. 1377, 1383-84 (M.D. Cal. 1995).

after discussing the matter with Ascension Parish School Board hearing officer Linda Lamendola. LeBlanc had been told by school officials that her son was entitled to a hearing. She was presented with a range of options and probable outcomes by Lamendola, including the option of pursuing a hearing, which Lamendola indicated had little chance of success, and the option of waiving her right to a hearing and enrolling her son immediately in the alternative school. After weighing the alternatives, LeBlanc made a rational decision to waive the hearing and enroll Adam in the alternative school. Based on this evidence in the record, Adam's contention that his mother's waiver was made involuntarily is without merit.[65]

## III

Adam did not brief whether the district court erred in granting summary judgment in favor of those defendants sued in their official capacities. This issue is waived. We find that the district court properly granted summary judgment as to Adam's Fourth Amendment and Procedural Due Process claims. While we cannot agree with its finding that there was no violation of the First Amendment, we affirm its judgment on its alternative ground that Principal Braud is entitled to qualified immunity.

The judgment of the district court is AFFIRMED.

---

[65]The record also contains evidence that LeBlanc was being advised by counsel at the time she signed the waiver form. However, the precise role and involvement of counsel in her waiver decision is unclear.

28